**Sandra J. ERJAVAC, Plaintiff,**

v.

**HOLY FAMILY HEALTH PLUS, Defendant.**

**No. 97 C 1107.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 13, 1998.

Michael David Robbins, Attorney, Chicago, IL, Gregory J. Schlesinger, Attorney at Law, Chicago, IL, for Sandra J. Erjavac, Plaintiff.

Robert Johns Mignin, Janet C. Hershman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Holy Family Health Plus, Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Sandra J. Erjavac is suing defendant Holy Family Health Plus under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, for disability discrimination. Erjavac, who worked for Health Plus as a managed care specialist, alleges that Health Plus failed to provide her with a reasonable

accommodation for her diabetes, subjected her to a hostile work environment, and constructively discharged her. Health Plus' motion for summary judgment pursuant to Fed. R.Civ.P. 56 is currently before this Court. For the reasons that follow, the motion is granted in part and denied in part.

## RELEVANT FACTS

We begin by presenting the facts in the light most favorable to the plaintiff.[1] Sandra J. Erjavac has insulin-dependent diabetes mellitus. Def.'s Facts ¶ 2. As a result, Erjavac is required to monitor her blood sugar levels constantly and give herself insulin injections multiple times a day. *Id.* ¶ 52; Pl.'s Facts ¶ 52. Erjavac must also follow a strict diet in order to control the disease. Def.'s Facts ¶ 52; Pl.'s Facts ¶ 52. In addition to having diabetes, Erjavac suffers from bulimia and depression. Def.'s Facts ¶¶ 3, 57, 60. Erjavac takes medication and has received psychological counseling for her depression for the past ten years.[2] *Id.* ¶¶ 3, 57, 61.

In August or September 1995, Erjavac submitted a job application to the Human Resources Department of Holy Family Medical Center ("Holy Family"). *Id.* ¶ 10. Holy Family Health Plus ("Health Plus"), a subsidiary of Holy Family, contacted Erjavac about interviewing for a managed care specialist position. *Id.* ¶ 11. The job description included physician credentialing and general office support, such as answering telephones and performing clerical work. *Id.* ¶ 13.

Three managers, Susan Natker (Executive Director), Cleopatra Smyrniotes (Utilization Manager), and Kate McMahon (Operations Manager), interviewed Erjavac for the position. *Id.* ¶¶ 11, 12. Health Plus later contacted Erjavac for a second interview and subsequently offered her the managed care specialist position. *Id.* ¶ 14.

A post-offer physical examination revealed Erjavac's diabetes. *Id.* ¶ 15. Erjavac asked the occupational health nurse not to disclose her diabetes to the department. Pl.'s Facts ¶ 15. Erjavac claims that she requested confidentiality because she was concerned about Natker's response to her general question about health care benefits during one of the interviews. *Id.* Natker allegedly responded: "Why? Are you sick?" *Id.* Natker then laughed and said, "Oh, I'm not supposed to ask that." *Id.* Erjavac nonetheless admits that her diabetes did not serve as a barrier to her employment. Def.'s Facts ¶ 15; Pl.'s Facts ¶ 15.

Erjavac began working at Health Plus in September 1995. She shared an office with another managed care specialist, Maria Velarde, in a converted patient room containing two desks and a bathroom. Def.'s Facts ¶ 16. Erjavac's position initially involved physician credentialing, taking minutes at meetings, typing correspondence, and sorting mail. *Id.* ¶ 17. Erjavac and Velarde also answered the sixty to eighty telephone calls coming into the office each day. *Id.* ¶ 18.

At the outset of her employment, Erjavac's supervisors told her that employees could not leave the work area unless someone covered the telephones. *Id.* ¶ 19. This policy existed before Erjavac's arrival and applied to both Erjavac and Velarde. *Id.* ¶¶ 19, 23. In February 1996, Erjavac first disclosed her diabetes to her supervisors. She expressed that she needed greater access to the bathroom than the current policy allowed. *Id.* ¶ 22.

Before disclosing her diabetes, Erjavac testified that if she needed to use the restroom when Velarde was unavailable, she could ask anyone to cover the telephones except Paula McNutt. Pl.'s Facts ¶ 23. After the disclosure, however, Erjavac claims that the telephone policy became more stringent. *Id.* Erjavac's supervisors told her that if she needed to use the restroom when Velarde was unavailable, she could ask only one of three supervisors to cover the telephones. Def.'s Facts ¶ 23; Pl.'s Facts ¶ 23.

This more stringent policy put even greater restrictions on Erjavac's access to the bathroom. As a result, Erjavac claims that

1. The facts are derived from statements that the parties filed with this Court under Northern District of Illinois' Local General Rule 12(M)–(N).

2. The record does not reveal the date of Erjavac's diagnosis.

on one occasion she ended up soiling her pants when McMahon refused to cover the telephones in Velarde's absence. Pl.'s Facts ¶ 23. Additionally, Erjavac states that when she asked a co-worker instead of a supervisor to cover the telephones, that co-worker was reprimanded. *Id.*

On March 28, 1996, approximately one month after she revealed her diabetic condition, Erjavac received a favorable performance review. Def.'s Facts ¶ 24. Erjavac received another favorable review on July 16, 1996, which resulted in a salary increase. *Id.* ¶ 26. Erjavac did not consider the March and July reviews to be discriminatory or harassing. *Id.* ¶ 27.

In September 1996, Health Plus began a reengineering process that eliminated approximately 100 positions and restructured many employees' job functions. *Id.* ¶ 28. Around the same time, Erjavac resigned from her position in the hopes of pursuing another job. *Id.* ¶ 30. At her going-away party in October, however, Erjavac approached Natker, Smyrniotes, and McMahon and asked if she could rescind her resignation. *Id.* ¶ 31. Without hesitation, Natker allowed her to do so. *Id.* Erjavac agreed to accept the changes resulting from the reengineering, including working in a new office, which contained four desks and a bathroom. *Id.* ¶¶ 29, 33. At the time Erjavac rescinded her resignation, she also told her supervisors about her problems with bulimia and depression, and explained that she needed additional time off work. *Id.* ¶ 34. Natker responded that this would be no problem. *Id.*

On December 5, 1996, Erjavac received a performance review from McMahon, who by that time had replaced Natker as Executive Director. *Id.* ¶¶ 38, 39. Erjavac met with McMahon and Smyrniotes to discuss the review. Pl.'s Facts ¶ 39. Erjavac scored a 43.21, indicating that she was meeting expectations overall. Def.'s Resp. ¶ 39. But Erjavac characterized the review as unfair. Def.'s Facts ¶ 38. Specifically, Erjavac was dismayed that the review criticized her for taking previously approved time off from work. Pl.'s Facts ¶¶ 35, 36. Despite this criticism, McMahon recommended a salary increase. Def.'s Facts ¶ 40.

During the meeting, Erjavac raised her need for better access to the bathroom, and asked for more flexibility as to whom she could ask to cover the telephones. Pl.'s Facts ¶ 39. McMahon allegedly refused to relax the telephone policy, responding, "if you don't like my rules, there's the door." *Id.* ¶¶ 39, 68.

Erjavac left Health Plus after receiving this review. Def.'s Facts ¶ 41. Health Plus did not fire or discipline her; rather, Erjavac says she quit because McMahon refused to relax the telephone policy. *Id.* ¶ 41; Pl.'s Facts ¶ 41.

After she left Health Plus, Erjavac filed a timely charge of disability discrimination with the EEOC. She received a Notice of Right to Sue, and then filed suit in this Court under the ADA. Erjavac alleges that Health Plus violated the ADA in three ways: (1) refusing to accommodate Erjavac's diabetes by rejecting her requests for better access to a restroom; (2) subjecting Erjavac to a hostile work environment based on her disability through various actions; and (3) constructively discharging Erjavac by insisting on strict adherence to the telephone policy. We now evaluate these claims under well-established summary judgment standards.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all the evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150; *Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is

not significantly probative, or just raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. 2505; *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993).

The court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993).

## ANALYSIS

### I. Disability Discrimination

The ADA prohibits employers from discriminating against a qualified individual with a disability because of that disability. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is an individual who, with or without reasonable accommodation, can perform the essential functions of the job that the individual holds or desires. *Id.* § 12111(8). Health Plus maintains that it is entitled to summary judgment on Erjavac's reasonable accommodation claim because Erjavac is not disabled within the meaning of the ADA and, assuming *arguendo* that she is disabled, Health Plus provided her a reasonable accommodation.

### A. Erjavac Is Disabled

■ To receive the ADA's protections, Erjavac must first show that she has a disability within the meaning of the ADA. *See Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995) (citations omitted). The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(A). Whether a person is disabled is an individualized inquiry, determined on a case-by-case basis *Roth,* 57 F.3d at 1454 (citing *Byrne v. Board of*

*Educ.,* 979 F.2d 560, 564 (7th Cir.1992)). The Supreme Court recently interpreted the ADA's statutory language to hold that a woman's HIV infection constituted a disability under the ADA. *Bragdon v. Abbott,* —— U.S. ——, 118 S.Ct. 2196, 2201, 141 L.Ed.2d 540 (1998). The Court broke down the statutory language into the following analysis:

> First, we consider whether respondent's HIV infection was a physical impairment. Second, we identify the life activity upon which respondent relies (reproduction and child bearing) and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Id.* 118 S.Ct. at 2201; *see also DePaoli v. Abbott Labs.,* 140 F.3d 668, 671 (7th Cir. 1998).

The EEOC has issued regulations interpreting the ADA, defining "impairment" as any "physiological disorder or condition" that affects one or more body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h). "Major life activities" include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). The EEOC's Interpretive Guidance appended to the regulations adds more detail, explaining that sitting, standing, lifting, and reaching are also major life activities. 29 C.F.R. app. pt. 1630, § 1630(2)(i).

An individual is "substantially limited" by an impairment if she is "significantly restricted as to the condition, manner and duration under which [she] can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). In determining whether a disability "substantially limits" a person from performing a major life activity, courts consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected

long term impact of or resulting from the impairment. *Id.* § 1630(j)(2).

█ Erjavac claims that her diabetes and depression, individually and together, meet these requirements for a disability under the ADA. This Court will first address whether Erjavac's diabetes is a disability. We begin with the latest word from the Supreme Court—*Bragdon v. Abbott*—which deals with HIV rather than diabetes, but provides useful guidance on how to assess conditions that, like diabetes, may appear asymptomatic at times.

In *Abbott*, the Supreme Court held that a woman infected with HIV suffers from a physical impairment from the moment she is infected, and that this impairment substantially limits the major life activity of reproduction. *Abbott*, —— U.S. ——, ——————, 118 S.Ct. 2196, 2204–06. In determining that HIV is an impairment, Court reviewed the medical and scientific evidence before it, discussing HIV's affects on the body's systems from initial infection to development into full-blown AIDS. The Court observed that the initial stage of HIV infection produces noticeable, mononucleosis-like symptoms; but after about three months, recedes into a so-called "asymptomatic phase." *Id.* at ——, 118 S.Ct. at 2203. During this phase, which can last up to eleven years, there may be periods when the infection appears dormant—from the outside—although, as the Court notes, "clinical features persist throughout." *Id.* But because the virus begins an immediate and irreversible attack as soon as it enters the body, the Court held that "HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection." *Id.* at ——, 118 S.Ct. at 2204.

Next, the Court held that reproduction— the activity in which the plaintiff claimed to be substantially limited—is a major life activity under the ADA. Although neither the ADA nor the Rehabilitation Act regulations include reproduction in the list of major life activities, the Court pointed out that these regulatory lists do not purport to be exhaustive. The touchstone for determining whether an activity falls within the rubric of "major

life activity," according to the Court, is its significance. *Id.* Because "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself," and "could not be regarded as any less important than [the listed activities of working and learning]," the Court found that reproduction easily meets the significance standard. *Id.* at ——————, 118 S.Ct. at 2204–05.

Finally, the Court's detailed evaluation of the medical evidence led it to hold that HIV substantially limits reproduction in two ways: an infected woman risks infecting her partner during the activities leading to conception, as well as the baby during gestation and childbirth. *Id.* at ——————, 118 S.Ct. at 2205–06. The Court emphasized that "substantial limitation" is not synonymous with "utter inability"; while HIV does not render conception and childbirth impossible, it puts the infected person at great risk of seriously damaging the public health—not to mention her own economic and legal welfare—if she engages in these activities. *Id.* at ——, 118 S.Ct. at 2206. The Court poignantly summed it up: "In the end, the disability definition does not turn on personal choice. When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." *Id.*

█ A number of principles emerge from this decision. First, it is clear that a disease need not produce continuous, identifiable (to the casual observer) symptoms in order to constitute an impairment. Second, not all major life activities must be enumerated in the EEOC regulations. An unlisted activity can be "major" if it is comparably "significant" to those listed. Third, an impairment can be substantially limiting even if the individual is still able to participate in the major life activity at issue; in other words, a substantial limitation need not be a barrier. All of these points guide us in determining whether Erjavac's diabetes is a disability, as we shall see below.

█ The most compelling authority bearing on our determination is a recent First Circuit case right on point, which holds that insulin-dependent diabetes can be a disability under the ADA, even if its treatment with

insulin eliminates the substantial limitation on major life activities. *See Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 866 (1st Cir.1998). The primary legal issue before the court was whether to assess diabetes in its mitigated form, i.e., when medicated with insulin, or in its uncontrolled form. After an extensive review of the ADA's legislative history and policy, the EEOC's interpretive regulations, and relevant authority from other circuits, the court held that the ADA protected the plaintiff as an insulin-dependent diabetic "without regard to whether some of his limitations are ameliorated through medication or other treatment." *Id.*

The court began with the statutory language. Because the ADA does not specify whether to view an "impairment" or its "substantial limitations" before or after ameliorative treatment, the court turned to the legislative history. *Id.* at 859. Both House and Senate Committee reports address the issue; they state that "in determining whether an impairment substantially limits a major life activity, the impairment 'should be assessed without considering whether mitigating measures, such as auxiliary aids or reasonable accommodations, would result in a less-than-substantial limitation.'" *Id.* at 859–60 (quoting H.R.Rep. No. 101–485, pt. III, at 28 (1989), *reprinted in* 1990 U.S.C.C.A.N. 445, 451; H.R.Rep. No. 101–485, pt. II, at 52 (1990); S.Rep. No. 101–116, at 23 (1989)). These same reports directly address diabetes as well: " 'persons with impairments, such as epilepsy and diabetes, which substantially limit a major life activity' " have disabilities " 'even if the effects of the impairment are controlled by medication' " *Id.* (quoting House and Senate Reports).

The court observed that this legislative history is consistent with the ADA's broad remedial purposes. In the statute's preamble, Congress expressed concern about the enormous and growing number of disabled persons. *Id.* at 862 (citing 42 U.S.C. § 12101(a)(1)). The ADA's stated purpose is " 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' " *Id.* at 861 (quoting 42 U.S.C. § 12101(b)(1)). Courts recognize that the ADA is a "broad remedial statute," and that remedial legislation "should be construed broadly to effectuate its purposes." *Id.* at 861 (internal quotations and citations omitted). In light of all this, the court found it "more consistent ... to interpret the words 'individual with a disability' broadly, so the Act's coverage protects more types of people against discrimination." *Id.* In response to the employer's fears that this interpretation would significantly expand employer liability, the court reminded it that plaintiffs must still prove that they are "qualified individuals" and that they were denied a "reasonable accommodation." *Id.* In contrast, construing disability to refer to impairments in their mitigated state would produce anomalous results by punishing those who take the initiative to bring their diabetes under control, while rewarding those who do not. *Id.* at 862–66 & n. 7. In short, explained the court, viewing diabetes in its ameliorated state " 'confus[es] the disease with its treatment.' " *Id.* at 862–63 (quoting *Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 937 (3d Cir. 1997)).

Next, the court examined the EEOC's interpretive regulations, which echo the House and Senate reports. The Interpretive Guidance to the regulations provides that both the impairment and substantial limitation determinations must be made "on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. app. pt. 1630, § 1630.2(h)–(j). Like the congressional committee reports, the regulations also use diabetes as an example of a condition that should be viewed in its unmitigated state: "[A] diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." *Id.* app. pt. 1630, § 1630.2(j). Although the court acknowledged that these interpretive regulations are not afforded the same deference as legislative regulations promulgated under the Administrative Procedure Act's process, it pointed out that they deserve "some deference" if they are "permissible construction[s]" of the statute. *Arnold,* 136 F.3d at 864 (citations omitted).

These interpretive guidelines, according to the court, are indeed permissible statutory interpretations because they square with the ADA's legislative history and policy, as well as the Department of Justice's "virtually identical" guidelines. *Id.* The court rejected the employer's argument that viewing diabetes in its untreated state reads the words "substantially limit" out of the statute:

> The key question is whether the statutory word "impairment" refers to treated or untreated impairments. The "substantially limits" requirement pertains to the impairment referred to in the first part of the definitional sentence, regardless of whether that impairment is read to mean the condition in its treated or untreated state. Thus, far from reading that requirement out of the statute, the EEOC's interpretive guideline helps to clarify an ambiguity in the statute, and places the statutory words "substantially limits" in proper relation to the impairment.... *The trier of fact must still decide whether the untreated impairment "substantially limits" any major life activity before the untreated impairment constitutes a disability within the meaning of the ADA.*

*Id.* at 864–65 (emphasis added). The court also reiterated that the EEOC admonishes courts to treat each alleged disability on a case-by-case basis, and not to consider any particular condition to be a per se disability. *Id.* at 865. Finally, the court pointed out that the majority of circuits have followed these guidelines and held that mitigating measures do not bear on whether an impairment is substantially limiting. *Id.*[3]

In line with all this authority, the court held that the plaintiff was entitled to ADA protection "if he is disabled based on his underlying medical condition, without regard to whether some of his limitations are ameliorated through medication or other treatment." *Id.* at 866. It thus reversed the district court's grant of summary judgment and remanded the case for purposes of determining whether the plaintiff's uncontrolled diabetes mellitus substantially limited a major life activity. *Id.* In closing, the court emphasized that its holding was limited to the facts and the physiological condition before it. *Id.*

The Seventh Circuit has not addressed whether to view allegedly disabling conditions in their treated or untreated state. Nor has it considered whether insulin-dependent diabetes is a disability in either its mitigated or unmitigated form. The only Seventh Circuit ADA decision involving a diabetic plaintiff is *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995), which held that the plaintiff police officer was not discharged "because of" his diabetes, but rather because of his failure to properly monitor the condition—which resulted in a diabetic reaction and loss of control over his squad car. The court also held that the plaintiff's request for a "second chance" to perform the job while properly monitoring his condition was not a reasonable accommodation as envisioned by the ADA. *Id.* at 666–67. These holdings simply make clear that an employer is free to fire a disabled person if he needs no accommoda-

---

**3.** *See, e.g., Doane v. City of Omaha*, 115 F.3d 624 (8th Cir.) (EEOC guidelines require that police officer's glaucoma be evaluated without regard to corrective measures), *cert. denied*, —— U.S. ——, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998); *Harris v. H & W Contracting Co.*, 102 F.3d 516 (11th Cir.1996) (applying EEOC guidelines to hold thyroid condition, although fully controlled by medication, was nonetheless substantially limiting in its unmedicated state); *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362 (9th Cir.1996) (upholding EEOC guidelines and holding that mitigating measures should not factor into whether plaintiff's psychological problems were disabling; but ultimately finding that her unmitigated condition was not substantially limiting), *cert. denied*, —— U.S. ——, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997). *But see Sutton v. United Air Lines*, 130 F.3d 893 (10th Cir.1997) (EEOC guidelines conflict with the ADA and corrective measures must be considered in determining whether poor eyesight is disabling); *Gilday v. Mecosta County*, 124 F.3d 760 (6th Cir.1997) (majority opinion) (holding EEOC guidelines are inconsistent with ADA's "substantial limitation" language, but finding issues of fact as to whether plaintiff's insulin-dependent diabetes was disabling in its controlled state). The Seventh Circuit quoted, but did not rely on or apply, the EEOC's Interpretive Guidance on mitigating measures in its 1995 decision *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446 (7th Cir.1995). It is impossible to tell from *Roth* whether the Seventh Circuit would endorse the guidelines as a permissible interpretation of the ADA.

tion and fails to perform up to expectations. The court does not hint at whether a "controllable" disability should be viewed in its treated or untreated state in deciding whether it merits ADA protection as a disability.

In the absence of controlling authority from this Circuit, we find the First Circuit's analysis and conclusions compelling, and, adopt them here. The *Arnold* decision is well-grounded in the ADA's legislative history and the EEOC's regulations, to which the majority of courts have adhered. Contrary decisions ignore the statute's legislative history, assert that the EEOC guidelines read "substantially limits" out of the statute without addressing *Arnold's* persuasive reasoning to the contrary, and claim conflicts (either between the statute and the regulations or within the regulations themselves) that are easily reconciled. *See Sutton v. United Air Lines*, 130 F.3d 893, 902 (10th Cir.1997); *Gilday v. Mecosta County*, 124 F.3d 760, 766–67 (6th Cir.1997) (majority opinion). Moreover, these decisions are not but *Arnold* is—consistent with the Supreme Court's decision in *Abbott*. *Abbott* holds that a condition does not cease to be an impairment simply because it becomes asymptomatic to the outsider. As such, the fact that insulin may control some of the outward manifestations of diabetes does not changes its status as an impairment if diabetes meets the regulatory definition of "impairment" in its unmitigated state.

■ Viewing Erjavac's insulin-dependent diabetes in its untreated form, we find that it meets all three prongs of the ADA's disability definition. First, it is undisputed that insulin-dependent diabetes is an impairment, that is, a "physiological disorder or condition" that affects one or more body systems. Second, the evidence shows that, if not treated with insulin, Erjavac's diabetes would substantially limit major life activities, most

notably life itself. The deposition testimony of Erjavac's physician, Dr. Nandkunar, supports this conclusion. Dr. Nandkunar testified that Erjavac's diabetes is brittle, meaning that her blood sugar levels fluctuate wildly and are unstable. If not moderated properly by insulin injections, Dr. Nandkunar testified, a sharp drop in Erjavac's blood sugar levels can put her in a coma. Nandkunar Dep. at 37–40. Moreover, "[i]t is generally understood that an insulin-dependent diabetic would be likely to suffer a coma or worse if unable to administer insulin as needed." *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1444 (W.D.Wis.1996) (citing 4 AUSMAN & SNYDER'S MEDICAL LIBRARY § 5:139(a) (1989) (insulin-dependent diabetes "requires patients to use insulin injections to prevent death")). Viewing this evidence in the light most favorable to Erjavac, we find that her untreated diabetes is substantially life-limiting.[4]

■ Even if we viewed Erjavac's diabetes in its treated form, however, we would still find that she has raised a fact issue as to whether it substantially limits a major life activity. Dr. Nandkunar testified that, even when taking insulin, Erjavac must eat constantly to prevent blood sugar fluctuations. When her blood sugar drops, Erjavac must stop all other activities and pursue the kinds of foods that will bring her levels back to normal. Nandkunar Dep. at 37–40. Erjavac also needs to urinate constantly even with insulin injections. When her blood sugar is too high, this need for frequent urination can leave her severely dehydrated. *Id.* Finally, Erjavac must also self-inject insulin several times a day to ensure stable blood sugar levels. *Id.*

Viewing these facts and the reasonable inferences from them in Erjavac's favor, they demonstrate that Erjavac's "treated" diabe-

---

4. Relying on the decisions in *Kelly v. Drexel University*, 94 F.3d 102, 106 (3d Cir.1996), and *Ouzts v. USAir, Inc.*, 1996 WL 578514, at *11–12 (W.D.Pa. July 26, 1996), *aff'd*, 118 F.3d 1577 (3d Cir.1997), Health Plus maintains that Erjavac has not made a "significant" showing of disability. The cases cited by Health Plus, however, are readily distinguishable because the alleged disabilities in those cases were not life-limiting. *See Kelly*, 94 F.3d at 103–04 (hip injury); *Ouzts*,

1996 WL 578514, at *1 (carpal tunnel syndrome). Although the Seventh Circuit has adopted a "significance" standard as well, *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 505–06 (7th Cir.1998) ("not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test."), a life-limiting disability such as Erjavac's insulin-dependent diabetes easily satisfies it.

tes substantially limits the major life activities of eating and the elimination of waste. Although these activities do not appear on the EEOC's regulatory list, the Supreme Court has made clear that the touchstone of a major life activity is not its presence on this non-exclusive list, but its comparative significance to the listed activities. *Abbott,* —— U.S. ——, —— – ——, 118 S.Ct. 2196, 2204–05. Eating and waste elimination are both essential to remaining alive. As such, these activities are even more significant than the listed activities of working or learning, neither of which is essential to sustain life.

Erjavac's treated diabetes also substantially limits these activities. Even with insulin injections, Erjavac must eat specific foods on a constant basis so that her blood sugar does not drop to life-threatening levels. This "significantly restrict[s]" the "condition, manner and duration" of her eating as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1). Likewise with her frequent need to eliminate waste; the average adult does not need such frequent access to the bathroom that they soil themselves while waiting to use it, nor is quick and flexible bathroom access essential to most persons' well-being at work. Finally, being required to self-inject insulin and to monitor blood-sugar levels several times a day is inherently life-limiting because it so greatly restricts Erjavac's freedom. Taking into consideration the severity, duration, and long-term impact of Erjavac's diabetes in its treated form, *see id.* § 1630(j)(2), it is severe (requires constant monitoring, self-injections, and urination), there is no evidence that it will ever be cured, and the long-term impact is that Erjavac's fluctuating blood sugar levels will always put her life at risk, regardless of how vigilantly she monitors her condition.

In arguing that Erjavac's diabetes is not substantially limiting, Health Plus relies heavily on a district court case from this Circuit, *Schluter v. Industrial Coils, Inc.,* 928 F.Supp. 1437 (W.D.Wis.1996), whose reasoning we must respectfully decline to follow and whose facts are distinguishable from this case. Schluter was an insulin-dependent diabetic who was removed from her position

supervising the production of electrical coils when she failed a government-mandated vision test. She alleged that her diabetes had caused her eyesight to deteriorate, and that her removal for poor eyesight was discrimination because of her diabetes. The court granted summary judgment to the defendant, holding that the plaintiff did not suffer from a disability.

The court first determined that the plaintiff's diabetes had to be viewed in its treated state. Ignoring the ADA's legislative history, the court reasoned that the EEOC regulations were inconsistent with the statute's language requiring a substantial limitation:

> If an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

*Id.* at 1445. Next, assessing the plaintiff's diabetes in its treated form, the court found that it was not substantially limiting. Her testimony about insulin reactions was "too vague" to be sufficiently probative, and was unaccompanied by medical or expert testimony. *Id.* at 1446. In any event, the court explained, plaintiff's insulin reactions were irrelevant because they were not the alleged reason for her removal—poor eyesight was. *Id.* at 1447. The evidence of limitations on her eyesight was also too insignificant to substantially limit the major life activity of seeing; the court observed that the plaintiff's vision was correctable to levels that other courts had held non-disabling as a matter of law. *Id.* (citations omitted).

We first point out our disagreement with *Schluter*'s reasoning, which "confus[es]" the disease with its treatment" and "conflates two separate parts of the ADA." *Arnold,* 136 F.3d at 862–63 (internal quotations and citations omitted). As *Arnold* correctly noted, viewing an impairment in its untreated state does not ignore the ADA's "substantial limi-

tation" language. The court or jury must still determine on a case-by-case basis whether the plaintiff's impairment, if left untreated, substantially limits a major life activity. The fact that this analysis will often produce a result favorable to the insulin-dependent diabetic does not, as *Arnold* observed, render it a "per se rule." *Id.* at 865. Furthermore, viewing impairments without ameliorative measures is directly in line with the ADA's clear legislative history and its broad remedial purpose to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It also adheres to the guidelines issued by the enforcing agencies—the EEOC and the Department of Justice—who have considerably more expertise in this area than federal judges. Employers remain protected by the other ADA components, such as the "qualified individual" and failure to provide a reasonable accommodation requirements, not to mention the most difficult hurdle of all—proving discrimination "because of" a disability. Finally, viewing disabilities in their untreated state avoids the unfair result of punishing those who take the initiative to bring their disabilities under control. *Id.* at 863 n. 7.

Our conclusion is bolstered by the fact that three other district judges in this Circuit have held that it is appropriate to evaluate disabilities, including diabetes, without the effects of treatment. *See Pater v. Deringer Mfg. Co.,* 1995 WL 530655, at *4 (N.D.Ill. Sept.7, 1995) (finding diabetic plaintiff disabled because "[t]he ADA has been construed by courts to cover diabetics in the past, reasoning that without medication, this disease is certainly disabling and life-limiting.") (citing *Sarsycki v. United Parcel Serv.,* 862 F.Supp. 336 (W.D.Okla.1994)); *Wixted v. DHL Airways, Inc.,* 1998 WL 164922, at * 17 (N.D.Ill. Apr.7, 1998) (the fact that plaintiff's

depression, panic disorder, and post-traumatic stress syndrome could be controlled by medication "does not imply that she does not suffer a substantial impairment of a major life activity or that she can fully control her illness") (citing *Krocka v. Riegler,* 958 F.Supp. 1333, 1339–40 (N.D.Ill.1997) (plaintiff's ability to perform duties as long as he took medication did not imply that he did not suffer substantial impairment of major life activity when plaintiff stated that, without his medication, his ability to get out of bed and, as a result, get to work, was substantially limited by his depression)).

Second, *Schluter*'s facts are distinguishable. Unlike Schluter, who relied exclusively on her own testimony and did not adequately describe the effects of her impairment, Erjavac presents the expert testimony of her physician, who described in detail the substantial limitations of Erjavac's diabetes in both its treated and untreated states. Erjavac also escapes the trap of relying on a limitation that is unconnected to the alleged adverse job action.[5] One of Erjavac's substantial limitations, the need to use the bathroom frequently for both urination and insulin injections, is the precise reason for Health Plus' alleged discriminatory refusal to relax the telephone policy or permit the necessary restroom access.

For the reasons above, we find that Erjavac's insulin-dependent diabetes is a disability under the ADA. She is therefore entitled to the Act's protections on this basis.

This is not the end of our inquiry, for Erjavac also claims that her depression and/or bulimia substantially limit one or more of her major life activities. Specifically, Erjavac claims that her depression affects her eating habits, impairs her ability to have relationships with others, and impacts her sleeping. Even viewing all the evidence in the light most favorable to Erjavac, we are

---

**5.** We seriously doubt the viability, after *Abbott*, of *Schluter*'s holding that the impairment's substantial limitation must be the alleged reason for the adverse employment action, i.e., that the plaintiff's insulin reactions were irrelevant because it was her poor eyesight that allegedly precipitated her removal. In *Abbott,* the Supreme Court held that HIV infection was disabling because it substantially limited the plaintiff's ability to reproduce. But her inability to reproduce had nothing to do with the alleged discrimination. The plaintiff in that case alleged that her dentist had violated the ADA by refusing to treat her in his office—a refusal made due to the perceived risk of infection, not the plaintiff's reproduction abilities. *See Abbott,* — U.S. —, —, 118 S.Ct. 2196, 2204, 141 L.Ed.2d 540.

unable to conclude that Erjavac has met her threshold burden of proving that her depression and/or bulimia is a disability under the ADA.

Erjavac stated that she could not recall whether she had experienced any of the above symptoms after January 1996. As such, Erjavac's depression and bulimia would likely fail the EEOC's durational requirement for a disability. *See* 29 C.F.R. app. pt. 1630, § 1630.2(j) ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities."). Nor does Erjavac point to any evidence indicating how these alleged impairments substantially limited her eating, ability to have relationships, or sleeping, or how frequently they plagued her. On this record, Erjavac has not produced the proof required to permit a reasonable juror to find that her bulimia or depression is a disability. "More than mere conclusory allegations are required to defeat a motion for summary judgment." *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1002 (7th Cir.1998) (citations omitted).

■ Even assuming that Erjavac's depression and/or bulimia substantially limited any major life activities, Erjavac has failed to present any evidence that Health Plus was aware of these conditions before October 1996, several months after it allegedly refused to accommodate her. "An employer that has no knowledge of an employee's disability cannot be held liable for not accommodating the employee." *Beck v. University of Wis.*, 75 F.3d 1130, 1134 (7th Cir.1996). And if Health Plus did not know about Erjavac's depression or bulimia when it refused to accommodate her, it could not have discriminated against her "because of" her disability. *See* 42 U.S.C. § 12112(a). Thus, even if Erjavac's depression or bulimia rendered her disabled, there is no evidence that would permit a jury to find that either condition was the basis for an ADA violation.

Having concluded that Erjavac's diabetes is a disability, we move on to whether Health Plus provided a reasonable accommodation for it.

**B. The Jury Must Decide Whether Health Plus Provided a Reasonable Accommodation**

■ The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer demonstrates that the accommodation "would impose an undue hardship" on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations under the ADA include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The Seventh Circuit has further instructed that "it is plain enough what accommodation means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Beck*, 75 F.3d at 1135 (quoting *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir.1995)).

■ To prevail on her failure to provide a reasonable accommodation claim, Erjavac must prove that she is disabled as defined by the ADA, that Health Plus was aware of the disability, and she was qualified for the position in question, with or without a reasonable accommodation. *Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 674 (7th Cir. 1998) (citing *Best*, 107 F.3d at 547–48). Erjavac has already established that has a disability, and that Health Plus knew about it. Now she must raise a genuine issue of material fact as to whether she was qualified,[6]

6. Health Plus does not dispute that Erjavac was "qualified." And our independent review shows that Erjavac easily meets this requirement, which involves a two-part inquiry. First, "the disabled individual must satisfy the requisite skill, experi-

ence, education and other job-related requirements of the employment position [she] holds or desires." *Nowak*, 142 F.3d at 1002–03 (quoting 29 C.F.R. § 1630.2(m)). Erjavac easily satisfies the first prong. Erjavac holds a bachelor's and

with or without a reasonable accommodation—which Erjavac identifies in this case as more flexible access to the restroom.

The employee has a duty to inform the employer about her disability before ADA liability may be imposed for failure to provide an accommodation. *Beck,* 75 F.3d at 1134. Through an interactive process, both parties bear some responsibility in determining what accommodation is reasonable. *Id.* at 1135. If a breakdown occurs in the interactive process, then:

> Courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.*

 Health Plus' brief suggests that Erjavac never requested a reasonable accommodation. Health Plus offers no factual support for this argument, however, and the uncontested facts show that Erjavac requested greater access to the restroom when she disclosed her diabetic condition in February 1996. This is more than adequate to satisfy her initial duty to begin the interactive process. *See Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996) ("properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation'...."). Erjavac's request for this accommodation triggered an interactive process requiring both parties' participation. *See Zamudio v. Patla,* 956 F.Supp. 803, 808 (N.D.Ill.1997) ("Once a disability has been summoned to

the fore, determining what specific actions should be taken by an employer requires an interactive process involving participation by both sides.").

In response to this request for more access to the restroom, Erjavac was told that she could contact one of the three supervisors to provide telephone coverage. Erjavac does not dispute that Health Plus provided this option. But she contends that it was not a reasonable accommodation because (1) it still did not permit adequate access to the restroom, as demonstrated by the fact that Erjavac soiled herself once when supervisor McMahon refused to cover the phones in the absence of Erjavac's co-worker, Maria Velarde; and (2) Erjavac had initially been able to ask anyone except Paula McNutt to cover the phones, not just one of three supervisors.

 In support of its motion for summary judgment, Health Plus offers no evidence or argument as to the reasonableness of the accommodation. *See id.* at 809 (placing burden on the defendant to show the reasonableness of the accommodation where the defendant asserted that a reasonable accommodation was provided). Instead, Health Plus merely recites the conclusory statement that the law does not require the exact accommodation requested by an employee, but rather a reasonable accommodation. *See Schmidt v. Methodist Hosp. of Ind., Inc.,* 89 F.3d 342, 344 (7th Cir.1996). Apparently, Health Plus misconstrues its obligations under § 12112(b)(5)(A). Although this Court agrees that an employer need not provide every accommodation an employee requests, merely providing an accommodation does not conclusively deem the accommodation reasonable.

 The interactive process triggered by an employee's request for an accommodation demands collaboration between the employer and the employee. Viewing the facts in the light most favorable to Erjavac, the commu-

---

master's degree. Additionally, during Erjavac's employment with Health Plus for approximately a year and a half, she received favorable reviews on all three of her performance evaluations. Second, the disabled individual must show that she "can perform the essential functions of such position" with or without an accommodation.

*Id.* at 1003 (quoting 29 C.F.R. § 1630.2(m)). As the following analysis illustrates, Erjavac has sufficiently raised a question of material fact as to whether she could perform the essential functions of the managed care specialist position with reasonable accommodations.

nication was one-sided—Erjavac made the requests, and Health Plus did not adequately address them. Although Health Plus did permit Erjavac to ask a supervisor to cover the phones when she needed to use the rest-room,[7] the facts indicate that Erjavac's access to the restroom was still inadequate—after all, she soiled herself in attempt to comply with the phone policy. When Erjavac asked someone other than a supervisor to cover the phones in an effort to prevent repeating the embarrassing incident, Erjavac's supervisors responded by reprimanding the covering coworker instead of engaging in an interactive process. They continued to enforce the telephone policy, knowing full well that it did not adequately accommodate Erjavac's need for restroom access. "A party that fails to communicate by way of . . . response may also be acting in bad faith." *Beck*, 75 F.3d at 1135. McMahon's reply to Erjavac's final request to relax the telephone policy further illustrates the lack of collaboration. She told Erjavac, "if you don't like my rules, there's the door."

Finally, although disputed by Health Plus, a jury might be persuaded by Erjavac's contention that the telephone policy became more stringent once she disclosed her diabetes. At the outset of Erjavac's employment, the telephone policy provided that an employee could not leave the work area unless someone covered the telephones. Erjavac maintains that at this time, she was allowed to ask anyone except Paula McNutt to cover the telephones. After Erjavac's disclosure, however, her supervisors modified the policy so that Erjavac was permitted to ask only one of the three supervisors to cover the telephones if Velarde was unavailable. A jury might reasonably conclude that this put greater restrictions on her restroom access, making accommodations less reasonable rather than more reasonable in response to Erjavac's request. It is also for the jury to decide whether Erjavac could have performed the essential functions of the managed care specialist position with more flexible restroom access.

Viewing the evidence in the light most favorable to Erjavac, Erjavac has demonstrated a genuine issue of material fact as to whether Health Plus reasonably accommodated her disability. Accordingly, Erjavac's ADA claim based on failure to provide a reasonable accommodation must go to the jury.

## II. Hostile Work Environment

 Health Plus also moves for summary judgment on Erjavac's hostile work environment claim. The Seventh Circuit has yet to address whether a hostile work environment claim exists under the ADA. Other Northern District of Illinois decisions, however, have recognized such a claim, following the harassment analysis under Title VII cases. *See Christou v. Hyatt Regency–O'Hare*, 996 F.Supp. 811, 816 (N.D.Ill.1998) (Bucklo, J.); *Gray v. Ameritech Corp.*, 937 F.Supp. 762, 771 (N.D.Ill.1996) (Shadur, J.); *Chua v. St. Paul Fed. Bank for Sav.*, 1996 WL 34458, at *4 (N.D.Ill. Jan.26, 1996) (Conlon, J.). Both parties appear to assume that the ADA supports such a claim. In line with the above line of cases and the parties' assumptions, we assume that the ADA may be violated when an employee is subjected to a hostile work environment on the basis of her disability.

To prevail on a hostile environment claim, Erjavac must show that she was subjected to conduct that unreasonably interfered with her work performance or created an intimidating, hostile, or offensive work environment. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) The harassment must be sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Id.* at 67, 106 S.Ct. 2399; *see also Burlington Indus. v. Ellerth*, —— U.S. ——, 118 S.Ct. –2257, 141 L.Ed.2d 633 (1998) (retaining distinction between hostile environment and quid pro quo harassment for purposes of determining whether any "harassment preceding the employment decision [is] actionable"; and hold-

---

7. The fact that Erjavac's non-disabled co-worker, Maria Velarde, was also permitted to ask a supervisor to cover the phones belies the assertion that this was an "accommodation" of Erjavac's disability.

ing that "the conduct must be severe or pervasive" to be actionable). "[R]elatively isolated instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir.1993).

Erjavac identifies various incidents that she believes created a hostile work environment. For example, she claims that (1) supervisor McMahon expressed dismay when Erjavac finally revealed her diabetes; (2) McMahon treated her harshly, constantly berating her with obscene and demeaning language; (3) Erjavac's doctors independently documented her deterioration during the time she worked at Health Plus; (4) McMahon began assigning Erjavac work just before lunchtime after discovering she had diabetes; and (5) Erjavac was forced to quit because of the hostile environment.

These alleged incidents, however, are too vaguely described, too infrequent and not sufficiently severe or pervasive to rise to the level of actionable harassment. *See Chua*, 1996 WL 34458, at *5 ("[T]he incidents are described by Lao Chua in vague terms, and without exact dates. The incidents apparently occurred over a period of years.... As a result, these acts are not so severe or pervasive as to create an objectively hostile environment as that term has been defined by the Seventh Circuit.") (citations omitted). This becomes even more clear when the alleged incidents are viewed in the context of the record evidence. McMahon's dismay at hearing about Erjavac's diabetes for the first time was simply a single incident that is not sufficiently severe or pervasive to have altered Erjavac's working conditions. The same conclusion applies to the two times (in a year-and-a-half of employment) that McMahon asked Erjavac to work on something before lunch. As for McMahon's alleged insults, the evidence shows—unfortunately, we might add—that McMahon used abusive language with many employees, not just Erjavac, and that she acted no more harshly

toward Erjavac than anyone else. *See id.* (finding no actionable harassment where "[t]he working environment at the bank also included a good deal of joking about many employees, not just Lao Chua."). Nor does the record support Erjavac's claim that her doctors recorded that she "deteriorated" while working at Health Plus. There is also no evidence that Erjavac quit because she was being subjected to a hostile environment based on her disability. It appears that Erjavac is trying to equate a failure to provide a reasonable accommodation with a hostile environment, an equation that finds no support in the facts or the law.

Other courts have granted summary judgment in more compelling cases. *See Chua*, 1996 WL 34458, at *4–5 (granting employer summary judgment where on various occasions, employees made fun of plaintiff's limp); *Christou*, 996 F.Supp. at 817 (granting employer summary judgment on the grounds that offensive statements such as "if you cannot see, then you have got no business being here" were not frequent or severe enough).

Not only does the alleged conduct lack the elements of severity and pervasiveness, there is no evidence that it interfered with Erjavac's work performance. In fact, Erjavac received favorable reviews on all three of her performance evaluations. Health Plus also gave Erjavac a salary increase based on the July 16, 1996 review, and recommended another salary increase based on the December 5, 1996 review (also the last day of Erjavac's employment with Health Plus).

Erjavac has failed to raise a genuine issue of material fact on her hostile work environment claim. Accordingly, we grant Health Plus' motion for summary judgment on this cause of action.[8]

### III. Constructive Discharges

Finally, Health Plus maintains that it is entitled to summary judgment on Erjavac's constructive discharge claim.[9] To defeat

---

**8.** Given our holding that Erjavac cannot establish an actionable harassment claim as a matter of law, it is unnecessary to address the standards for employer liability, which the Supreme Court clarified just last month in *Burlington Indus. v.*

*Ellerth*, —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**9.** Although not raised by the parties, there also is a question of whether a claim of constructive

Health Plus' motion on this claim, Erjavac must show that Health Plus made her working conditions so intolerable—in a discriminatory way—that a reasonable person would have been compelled to resign. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). Because Erjavac did not seek legal redress while she was employed at Health Plus, she must also show that she was "confronted with an aggravating situation beyond ordinary discrimination." *Id.*

■ Erjavac has not met these burdens. To begin with, Erjavac does not even attempt to defend her constructive discharge claim in her brief opposing summary judgment. Even considering the bare factual allegations in her complaint, they fail to meet the standards for constructive discharge for the very same reasons Erjavac's hostile work environment claim fails. Given our conclusion that no reasonable juror could find that Erjavac was subjected to a hostile work environment that interfered with her performance, it is clear that no reasonable juror could find Erjavac's work conditions so intolerable that she was forced to resign.

Moreover, the facts belie intolerable working conditions that forced resignation. Erjavac worked at Health Plus for approximately a year and a half. She resigned in September or October 1996, only to ask for her position back shortly thereafter when she failed to obtain alternate employment. As stated in *Gray*, this is "hardly the type of behavior that one would expect from a person so oppressed by her working conditions that she could not seek legal redress before leaving her job." *Gray*, 937 F.Supp. at 773.

While Erjavac may indeed succeed in proving disability discrimination, there is no evidence that it was "aggravated" beyond ordinary discrimination, or that her working conditions required resignation. Accordingly, Health Plus is entitled to summary judgment on Erjavac's claim for constructive discharge.

discharge exists under the ADA. *See Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir.1996) (stating that "we need not decide the question of whether a claim of constructive

## CONCLUSION

For the reasons above, this Court grants in part and denies in part Health Plus' motion for summary judgment. The motion is denied as to Erjavac's reasonable accommodation claim, and granted as to her hostile environment and constructive discharge claims. The parties are ordered to attend a status hearing on August 19, 1998 at 9:30 a.m. to set a fair and efficient schedule for trial on Erjavac's reasonable accommodation claim under the ADA.

discharge is cognizable under the ADA."). Again, we will assume *arguendo* that such a claim exists because we find that Erjavac's claim fails on the merits.