**John LAWSON, Sr., Plaintiff,**

v.

**CSX TRANSPORTATION, INC., Defendant.**

**No. IP 98–1182–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 20, 1999.

Robert S Rifkin, Maurer Rifkin & Hill, P.C., Indianapolis, IN.

Michael Marine, Ice Miller Donadio & Ryan, Indianapolis, IN.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, John Lawson, Sr. ("Lawson"), alleges that Defendant CSX Transportation, Inc. ("CSX"), failed to hire him for a conductor trainee position in February 1998 because he was disabled, in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). CSX responds that Lawson is not disabled as defined by the ADA, that even if he is disabled as defined by the ADA he was not qualified for the conductor trainee position, and that CSX had a legitimate, nondiscriminatory reason for not hiring Lawson. CSX requests Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, CSX's motion must be *GRANTED.*

## Factual Background

### A. CSX And The Railroad Conductor Trainee Position

CSX is a railroad transportation company based in Jacksonville, Florida. *See* Def. CSX Transportation, Inc.'s Br. in Supp. of Its Mot. for Summ. J., Def.'s Statement of Material Facts ("Def.'s Material Facts") ¶ 1. CSX serves mainly the eastern United States and employs approximately 25,000 persons nationwide. *See id.* ¶ 2.

Among other positions, CSX hires railroad conductors who perform a very important function within the CSX transportation system. The conductor coordinates the activities of train crews engaged in transporting freight on a freight train and supervises the activities of switch engine crews. *See id.* ¶¶ 9, 10. The position can be both dangerous and physically demanding. *See id.* ¶ 11. Conductors usually work outdoors, performing these activities around moving equipment where there are many distractions. *See id.* ¶ 12. They do not work on a fixed schedule; a conductor must be willing and able to travel to locations other than the primary work location according to a schedule that may call for overnight stays and non-standard work hours, variable shifts, permanent night shifts, weekends and/or holidays. *See id.* ¶¶ 13, 14.

The general methods by which CSX hires and trains conductors is not disputed by the parties. One source CSX uses to supply conductors is railroad conductor trainees. *See id.* ¶ 5. All such trainees are hired with the expectation that they will successfully complete training programs with CSX and be promoted to the position of conductor. *See id.* ¶¶ 6, 8. Trainees are culled from both a pool of direct applicants to CSX and graduates of training courses at one of several colleges, including Cincinnati State Technical and Community College. *See id.* ¶¶ 19, 20. Materials for training courses are provided by CSX and CSX employees teach the classes in the classroom portion of the course. *See id.* ¶¶ 25, 26. Despite this involvement by CSX in the training course, CSX does not directly own or operate the training program at Cincinnati State, nor does it decide whom Cincinnati State should admit. *See id.* ¶ 27.

The parties agree that although CSX does not control Cincinnati State's training course or its admission practices, there is a close relationship between the two when it comes to enrollments in Cincinnati State's training program. CSX notifies the college of job slots in advance and Cincinnati State recruits students to fill these slots. *See* Plaintiff's Response to Defendant's Motion for Summary Judgment, Lawson's Statement of Additional Material Facts ("Additional Material Facts") ¶ 115. While CSX does not guarantee jobs for all applicants who successfully complete Cincinnati State's training program, approximately 98 percent of all graduates from CSX-affiliated colleges are hired by CSX. *See id.* ¶¶ 114, 120; Def.'s Material Facts ¶ 33.

As part of her duties with CSX, Laurie Ryan prepared the railroad conductor trainee "job description" and provided it to the colleges, including Cincinnati State. *See* Additional Material Facts ¶¶ 96, 97.[1] That job description sets out the experience and qualifications required for the CSX conductor trainee position as: "graduation from a five-week conductor training

---

1. CSX disputes Lawson's characterization of the document provided to him as a "job description," claiming instead that it is a "job vacancy notice." *See* Def.'s Reply to Additional Material Facts ("Reply to Additional Material Facts") ¶ 96. While this disagreement appears to relate to the title of the document CSX provided to Lawson through Cincinnati State, it is really a dispute about whether the document was intended to contain general information about job openings or to set forth every qualification for that position. *Compare id. with* Additional Material Facts ¶ 98. Ryan herself describes the document as a "job description." *See* Dep. of Laurie Ryan ("Ryan Dep.") at 44. We, therefore, will use this terminology as well.

program, a high school diploma or GED, good physical condition (including vision, color vision, hearing and the ability to lift 85 [pounds]) and a tenth grade reading level." *Id.* ¶ 98. CSX contends that this description was not meant to be a complete statement of the requirements for the trainee position. *See* Reply to Additional Material Facts ¶ 98. CSX asserts that it also looks for trainees exhibiting responsibility, safety, dependability, and a solid employment history. *See* Def.'s Material Facts ¶¶ 15, 16. Lawson, however, disputes that these traits are truly important to CSX in hiring trainees. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Resp. to Def.'s Material Facts ("Resp. to Def.'s Material Facts") ¶¶ 15, 16.

Once a trainee is enrolled in the Cincinnati training course, he or she must complete five weeks of classroom work and obtain a minimum grade of 85 percent in his or her course work to pass. *See* Def.'s Material Facts ¶¶ 23, 24. Enrollees in good standing are guaranteed an interview with CSX for a conductor trainee position, but they are not required to seek employment with CSX; and as we have noted previously they are not guaranteed a job offer upon their successful completion of the conductor training course. *See id.* ¶¶ 28, 30, 33.

Interviews are conducted by CSX during the five-week training course. *See id.* ¶ 31. At the time of an interview, the CSX interviewer will not have had access to the applicant's scores on his or her classroom tests. *See id.* ¶ 32. Because offers of employment are extended by CSX prior to the course's completion, class rankings are unavailable at the time an employment decision is made; therefore, applicants are not given preferential hiring treatment based upon class rank. *See id.* ¶¶ 71, 72. If an applicant provides a successful interview and an offer of employment is extended by CSX, it is contingent upon the applicant's successful completion of the Cincinnati State course. *See id.* ¶ 32.

CSX claims that in addition to the qualifications set out in the job description, CSX interviewers look for applicants with a solid, verifiable work history. *See id.* ¶ 73. Lawson disputes this assertion, pointing to instances where CSX has, in fact, hired applicants without verifying their employment history, applicants who have less than one year of employment experience and applicants who had only a few months of part-time, unskilled work. *See* Additional Material Facts ¶¶ 121, 122. CSX responds, admitting that exceptions have been made, that on occasion an offer is extended to someone who does not meet all of CSX's preferences. *See* Def.'s Material Facts ¶ 74 n. 5. CSX explains that hiring is a process that properly involves "subjectivity on the part of the interviewer(s), and [is] dependent upon the applicant's effort and ability to 'sell themselves' during the interview process." *Id.* As of February 1998, CSX had no written standards or policies to guide the interviewer's evaluation of applicants and no written standards or policies for allowable exceptions to the alleged job prerequisites. *See* Additional Material Facts ¶¶ 138, 139.

### B. Lawson's History Of Diabetes

For thirty-three of Lawson's thirty-five years of life, he has suffered from insulin-dependent, "Type I," diabetes. *See* Def. Material Facts ¶ 34, Aff. of Paul A. Skierczynski ("Skierczynski Aff.") ¶ 6(b). His medical history establishes that he has had to endure a variety of complications commonly associated with diabetes: limited joint mobility syndrome, diabetic retinopathy in each eye, hypoglycemia, hyperglycemia, microalbuminuria, and fading erectile ability. *See* Additional Material Facts ¶¶ 78, 80; Skierczynski Aff. ¶ 6(c), (i). In addition, Lawson suffers from depression, high blood pressure, and a history of elevated A–1 C hemoglobin levels. *See* Additional Material Facts ¶ 78; Skierczynski Aff. ¶ 6(c), (k).

Lawson has suffered physically from these ailments. He struggles with swell-

ing in his hands and wrists and pain in his elbows, hips, and feet. *See* Additional Material Facts ¶ 80. In 1995 and 1996, he had surgery on each eye to control damage to his vision caused by the retinopathy. *See id.* ¶ 81, Skierczynski Aff. ¶ 6(g), (h). He has a history of proteinuria which is expected to progress over the years to renal failure. *See id.* ¶ 6(*l*). Lawson has also experienced headaches, bouts of the "shakes," and impotence. *See* Additional Material Facts ¶ 82, Skierczynski Aff. ¶ 6(i).

Prior to 1983, Lawson was hospitalized numerous times due to fluctuating glucose levels. *See* Lawson Dep. at 32, Skierczynski Aff. ¶ 6(d). However, the complications have not required that he be hospitalized at all since 1983. *See* Lawson Dep. at 31–33.[2] In December 1994 or 1995, Lawson suffered a severe hypoglycemic reaction causing him to become confused and briefly to lose consciousness. *Compare* Additional Material Facts ¶ 92 (stating incident occurred in December 1994) *with* Skierczynski Aff. ¶ 6(f) (stating incident occurred December 1995).[3] As recently as July 1999, Lawson experienced wildly fluctuating glucose levels and both hyperglycemia and hypoglycemia. *See* Skierczynski Aff. ¶ 6(e).

Because of Lawson's diabetes, his blood sugar and metabolic processes cannot be regulated in the same way as in an otherwise healthy person. *See id.* ¶ 18. His body does not properly metabolize carbohydrates, protein, and fat. *See id.* ¶ 15. Treatment for diabetes requires Lawson to inject insulin, follow a diet plan, exercise daily, and test his blood sugar several times a day. *See id.* ¶ 12. Insulin treatment is not a cure for diabetes; rather it treats the disease's symptoms, lessening the acute and chronic impact of diabetes and other medical complications, and helps minimize blood sugar fluctuations. *See id.* ¶ 9.

It is important for an insulin-dependent diabetic to carefully monitor blood sugar levels and to minimize fluctuations. *See id.* ¶ 14. If blood sugar levels drop, diabetics must stop all other activities in which they may be engaged at the time and take in the kinds of food that will bring sugar levels back to normal. *See id.* Because of this, a diabetic, such as Lawson, may not eat the food that he wants, whenever or wherever he desires it. *See id.* ¶ 15. Diabetics ordinarily must concern themselves with issues that non-diabetics tend to take for granted, i.e., the availability of food, the timing of meals, and the types and quantity of food consumed. *See id.*

Lawson's current physical state gives rise to long-term concerns. We are informed in the Skierczynski affidavit that diabetes is a non-curable, progressive metabolic disease. *See id.* ¶ 10. The inability to properly regulate his blood sugar levels will always put a diabetic's life at risk. *See id.* ¶ 13. Given fluctuating glucose levels and abnormally high A–1 C hemoglobin test results, Lawson's existing medical problems are at a high risk of aggravation, resulting in serious long-term complications. *See id.* ¶ 16. Dr. Skierczynski has opined, to a reasonable degree of medical certainty, that "even with continuous medical treatment and monitoring of his disease, Lawson has not been able to properly control his blood sugar levels

---

**2.** Although the statement of Additional Material Facts asserts that the hospitalizations occurred prior to 1986, Lawson's own deposition testimony reflects that his only hospitalizations after 1984 were for carpal tunnel syndrome, laser eye surgery, and a tonsillectomy. *See* Lawson Dep. at 31–33.

**3.** CSX disputes that the incident ever occurred, referencing contradictions in Lawson's deposition testimony. *See* Reply to Ad-

ditional Material Facts ¶ 92 (citing Dep. of John Lawson, Sr. at 31–33 as failing to identify any hospitalization between 1984 and 1997 due to hypoglycemia). We conclude for purposes of summary judgment, that the incident described by Lawson and Skierczynski did, in fact, occur either in 1994 or 1995; however, we also note that it did not require Lawson to be hospitalized.

for several years ... and his medical condition will continue to deteriorate over time as a direct consequence of his diabetes." *Id.*

## C. Lawson's Prior Work History

■ Having graduated from high school in 1984, Lawson worked at his parents' kennel business in Brazil, Indiana through 1985. *See* Def.'s Material Facts ¶ 37.[4] In 1986, Lawson worked simultaneously at a Burger King and a Noble Romans pizza restaurant. *See* Def. Material Facts ¶¶ 38–39. Lawson left these jobs for reasons unrelated to his diabetes. *See id.* ¶¶ 40–41. His reason for quitting Burger King after about three months was because his wife was pregnant and his pay did not justify the number of hours he was expected to work. *See* Lawson Dep. at 22–23. Lawson was terminated from Noble Romans after working there for five months for reasons, Lawson believes, relating to his having won a bet with his boss for five dollars which his boss would rather fire him for than have to pay it. *See* Def.'s Material Facts ¶¶ 38, 41; Lawson Dep. at 23–24.

Beginning in August 1986, Lawson received Social Security total disability benefits. *See* Def.'s Material Facts ¶ 43. Lawson continued to receive those benefits over the next twelve years. *See id.* ¶¶ 44–45. From August 1986 to March 1997, Lawson was not required to make any efforts to locate employment as a prerequisite for remaining on Social Security disability. *See id.* ¶ 46.

Although Social Security regulations did not require him to work, Lawson did perform several jobs and attended vocational school between 1988 and 1991. In June 1988, Lawson obtained a summer position with Eldred Van and Storage. *See id.* ¶ 47; Additional Material Facts ¶ 88. After completing that job, Lawson enrolled in Indiana Vocational Technical College ("Ivy Tech") in Terre Haute. *See* Additional Material Facts ¶¶ 87–88. Over the next three and a half years, Lawson worked on completing a double major in computer-aided drafting and computer-aided manufacturing. *See id.* ¶ 87. For two months, between February and April 1991, while still attending Ivy Tech, Lawson also worked part-time at Belson Scrap and Steel. *See id.* ¶ 89; Lawson Dep. at 46. Because the time constraints of his job at Belson kept Lawson "away from" his school work, Lawson believes he was caused to flunk out of Ivy Tech prior to completing the program. *See* Lawson Dep. at 46.

No longer in school, Lawson was offered a full-time position by Belson. *See* Additional Material Facts ¶ 90. Lawson testified that he refused Belson's offer because the position would have required him to travel and be away from home and his family for two or three weeks at a time and it only paid five or six dollars an hour. *See id.* He "would not have made enough money to replace his social security disability benefits, the job had no potential, and the job utilized none of his technical schooling." *Id.* (citing Lawson Dep. at 89,

---

4. Lawson also claims in his affidavit to have worked doing a variety of "odds and ends" tasks and for a "mom and pop" construction company during this time. *See* Additional Material Facts ¶¶ 84, 85 (citing Lawson Aff. ¶¶ 6, 7). CSX objects to this testimony, stating that it contradicts Lawson's deposition testimony. *See* Reply to Additional Material Facts ¶ 84, 85 (citing Lawson Dep. at 19–20). Lawson was asked at his deposition whether he found any work in 1984 or 1985, to which he answered unequivocally "No." *See* Lawson Dep. at 19–20. Unless there is a compelling reason to the contrary, we do not permit a witness to contradict his own deposition testimony by subsequent affidavit created in an effort to change the facts previously testified to. *See Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995). Lawson's deposition response leaves no room for needed clarification, nor does it appear that the questioning had caused Lawson to become confused. Therefore, we will not consider Lawson's affidavit as admissible evidence to the extent it contradicts his deposition testimony that his only job between 1984 and 1986 was working at his parents' kennel.

90 and Lawson Aff. ¶ 8).[5] Lawson submitted other applications for full-time work as well between 1988 and 1998, but was never employed in any other capacity except for the above mentioned five months at Eldred and Belson. *See* Def.'s Material Facts ¶ 51; Additional Material Facts ¶ 91.

### D. Lawson's Enrollment at Cincinnati State and Interview with CSX

Lawson enrolled at Cincinnati State and began taking classes in January 1998. *See* Def.'s Material Facts ¶ 57. It is undisputed that the impetus for this action by Lawson came from the Social Security Administration. As referenced above, between 1986 and March 1997, Lawson was not required to seek employment as a condition of receiving total disability benefits. *See* Def.'s Material Facts ¶ 46. However, in March 1997, a Social Security representative contacted Lawson's caseworker at Ivy Tech, Frank Whittle ("Whittle") and noted that Lawson's "medical seem[ed] to be getting better and they were wanting to know if [he] would like to try getting employed again." Lawson Dep. at 29. Whittle met with Lawson and relayed the gist of that conversation to him, prompting Lawson to try to get back to work. *See id.* at 34–35.[6]

After meeting with Whittle, Lawson looked into enrollment with Cincinnati State, which sent the CSX conductor trainee job description, prepared by Ryan, to Lawson. *See* Additional Material Facts ¶ 101. Lawson obtained the enrollment information packet, took the necessary pre-entrance tests and enrolled at the school. *See* Def.'s Material Facts ¶¶ 55–57. Prior to his enrollment, Lawson was informed by Cincinnati State that he would have to pass a CSX-mandated physical examination if he expected to be hired by CSX upon completing the training program. *See* Additional Material Facts ¶ 103. As a result, Lawson arranged for a physical examination conducted by Dr. Susan Amos. *See id.* ¶ 104; Stipulation for Purposes of Summ. J. Mot. ("Stip.") ¶ 3. The results of the physical exam indicated that Lawson was in good general condition, which conclusion Lawson passed on to Cincinnati State personnel when he took the school's pre-admission tests. *See* Additional Material Facts ¶ 104.

Lawson applied for employment with CSX, noting a preference for working at CSX's Terre Haute location. *See* Def.'s Material Facts ¶¶ 59–60. Sometime in early February 1998, when Lawson had completed approximately one-half of the conductor training course, he was given an interview of approximately thirty minutes in duration by CSX employees, Ryan and

---

5. CSX objects to Lawson's affidavit's assertion of reasons for declining Belson's offer because in his deposition, "Plaintiff stated *only* that he declined this continued employment because he did not want to travel away from home." Reply to Additional Material Facts ¶ 90. While it is accurate that the only reason mentioned in his deposition was the travel, the cited portion of the deposition shows *no effort on the part of CSX to pin Lawson down* with regard to this being his only motivation. *See* Lawson Dep. at 89–90. As such, it is permissible for the deponent, Lawson, to clarify his deposition answer in a later affidavit. *See Russell*, 51 F.3d at 67–68.

6. Although both parties reference the above-recited facts in their statements of material facts, they draw different conclusions from them. *Compare* Def.'s Material Facts ¶ 52 ("Social Security personnel suggested that Plaintiff attempt to find employment") *with* Pl.'s Resp. to Def.'s Mot. for Summ. J., Pl.'s Resp. to Def.'s Material Facts ("Resp. to Def.'s Material Facts") ¶ 52 ("Social Security offered to assist Lawson in finding employment. Lawson agreed."). Similar disparities are apparent by comparing CSX's statement of Material Facts ¶¶ 53–54 with Lawson's responses to these paragraphs. These arguments do not pertain to the evidence, but to conclusions drawn from the evidence. The parties' Local Rule 56.1 submissions are not the proper place for the parties to explicate their respective conclusions from the facts of the case. *See Pike v. Caldera*, Docket No. IP 98–0204–C–T/G, Entry Discussing Pending Motions to Strike and Motions for Leave (S.D.Ind. Sept. 7, 1999) (available from the Clerk's office for the Southern District or from our website at <http://www.insd.uscourts.gov>).

Jeanie Layne ("Layne"). *See id.* ¶ 109; Def.'s Material Facts ¶¶ 66, 69. What occurred at this interview forms the crux of Lawson's discrimination claim in that shortly thereafter CSX rejected Lawson for hiring as a conductor trainee. *See* Def.'s Material Facts ¶ 72.

At this interview, among other things, the CSX interviewers asked Lawson about his work history. *See id.* ¶ 63. Other than the five months of employment with Eldred and Belson, Lawson had had no other full or part-time employment or volunteer work after 1988. *See id.* ¶ 64. CSX maintains that during this interview Lawson told the interviewers that he was disabled only from 1988 to 1991. *See* Ryan Dep. at 85, 113–14; Layne Aff. ¶¶ 6, 7. Ryan states that when she asked why he had not been working since 1991, Lawson answered that he had voluntarily chosen to stay at home with his children and had not been looking for work. *See* Ryan Dep. at 82–83. In contrast, Lawson testified that he told Ryan and Layne that his lack of prior employment experience was the result of his diabetic condition and that he had been totally disabled for a number of years. *See* Lawson Aff. ¶ 16.

Both sides agree that Lawson told Ryan and Layne at the interview that he had diabetes. *See* Ryan Dep. at 81. Lawson gave Ryan a note from Dr. Amos relating to his physical condition. *See* Stip. ¶ 3. The parties also agree that at the time of the interview Lawson did not represent that he was currently disabled. *See* Def.'s Material Facts ¶ 66. Lawson says he told the interviewers how his diabetes was being treated and that he was educating his classmates at Cincinnati State on how to treat him in the case of an emergency. *See* Additional Material Facts ¶ 111. Lawson further says that neither Ryan nor Layne made any representations to him, during or immediately after the interview, about his job prospects with CSX and Ryan and Layne did not have access to Lawson's final test scores or his class rank at the time of the interview. *See* Def.'s Material Facts ¶ 67.[7] Lawson eventually graduated with a running quiz average of 96.1% and an overall class average of 94.5%. *See id.* ¶ 70; Additional Material Facts ¶ 108.

Following the interview with Lawson, CSX decided not to extend an offer to him for a conductor trainee position. CSX represents that, based upon his work history, Lawson was not hired, having worked a total of only five months at two jobs during the past ten years. *See* Def.'s Material Facts ¶ 74. CSX contends that such a work history does not demonstrate responsibility, safety or dependability and that Lawson "did not offer CSX any reason to make an exception in his case." *Id.* ¶ 75. Lawson admits that his work history does not demonstrate responsibility, safety, or dependability and that he gave Ryan and Layne no reason to make an exception in his case. *See* Def.'s Material Facts ¶ 75; Pl.'s Resp. to Def.'s Material Facts ¶ 75. Lawson contends, however, that CSX does not look for these qualities and that his employment history did not in fact impact CSX's decision not to hire him. *See* Pl.'s Resp. to Def.'s Material Facts ¶ 75. Lawson cites as support other instances when CSX employed persons who had failed to meet its alleged job qualifications, hiring people without a high school diploma or GED, persons with felony convictions, persons who have worked only part time jobs, persons who have less than one year of work experience, and persons with no verifiable work experience at all. *See* Additional Material Facts ¶ 127.[8]

---

7. CSX disputes Lawson's version of the interview, pointing to Ryan's testimony that she told Lawson at the end of the interview that "with the work history [she] saw there, [she] did not think an offer would be forthcoming." Def.'s Material Facts ¶ 68 n. 4 (quoting Ryan Dep. at 118). However, CSX correctly concedes that for the purposes of summary judgment, we must accept as true Lawson's testimony as to what was said at the meeting.

8. Lawson provides portions of employment applications of other individuals who had been hired by CSX for the conductor trainee

Shortly after CSX informed Lawson of its decision not to hire him, he spoke with Ryan by telephone. *See id.* ¶ 128; Def.'s Material Facts ¶ 76. In this conversation, Ryan told Lawson that "if [Lawson] wanted to go flip hamburgers for a year, [CSX] would reconsider [his] application." Def.'s Material Facts ¶ 76. Ryan also told Lawson that CSX did not make an offer of employment to him because he did not have a solid verifiable work history. *See* Additional Material Facts ¶ 128. Despite this representation by Ryan, Ryan has since stated that she did not attempt to verify Lawson's employment history prior to making the decision not to hire him and that as far as she was concerned, her inability to verify Lawson's employment had no bearing on her decision. *See* Additional Material Facts ¶¶ 131,132. Ryan told Lawson that CSX also based its decision on the long time gap since the job at Belson, an assertion which Lawson does not dispute. *See* Ryan Dep. at 109.[9] The parties do dispute, however, whether Ryan told Lawson that one reason for the decision was because he had not been continuously employed for at least three years; Lawson says she did make that statement, Ryan says she did not. *See* Additional Material Facts ¶ 129 (citing Lawson Dep. at 119). Lawson believes that employers other than CSX have refused him employment in the past based on his diabetes and that his diabetes must also have motivated CSX's decision not to hire him. *See* Def.'s Material Facts ¶ 77.[10]

In addition to noting the exceptions CSX has made to its hiring policies in other situations, Lawson points to other circumstantial evidence to establish that CSX was discriminating against him when it decided not to hire him. Apparently, each of the other, fourteen people who enrolled in the Cincinnati State course with Lawson and successfully completed the course were offered conductor trainee jobs by CSX. *See* Stip. ¶ 1. Moreover, none of the persons ultimately hired by CSX for these positions were known by CSX to be disabled at the time they began employment with CSX. *See id.* ¶ 2. The conductor trainee position, as described by Ryan in the job description, is the position for which Lawson received training at Cincinnati State, establishing that at the time Lawson was interviewed by CSX, he possessed the training, skills, education, and physical abilities required by CSX for the advertised position and was capable of performing all of the essential duties of the position. *See* Additional Material Facts ¶¶ 100, 134, 135.

After being turned down by CSX, Lawson sought work with other employers but was unable to find employment. *See* Additional Material Facts ¶ 133. Lawson filed a charge of discrimination against CSX with the Indiana Civil Rights Commission ("ICRC"). *See* Additional Material Facts ¶ 130. In response, CSX maintained that it had made its decision because Lawson did not have a solid employment history, because he had misrepresented his em-

position. *See* CSX's Response to Letter Requesting Production of Documents—CSX Employment Applications. CSX contests the admissibility of these applications based on their being incomplete and failing to account for the variety of factors for which CSX interviewers are looking when they interview applicants. We accept CSX's concerns, but will consider the documents for what they do show: CSX employed some applicants who had work histories consisting of only a few months, sometimes solely of part-time jobs. *See id.* However, all the applications provided also show that each applicant had held at least one job in the twelve months prior to being hired by CSX. *See id.*

9. CSX points out that, while Lawson cites this excerpt from Ryan's deposition to support paragraph 128 of his additional material facts, he omits it in his factual statement. We conclude that since Lawson is relying on this testimony, it is proper for us to consider it and assume that Lawson is not disputing its veracity.

10. Lawson provides an example in his brief: some time between 1984 and 1998 Lawson applied for work with Great Dane Trailers and was told "off the record" that the company would not hire him given his diabetic history. *See* Additional Material Facts ¶ 86.

ployment experience and because his employment could not be verified. *See id.*[11] Thereafter, Lawson filed the complaint in this action. Interestingly, following the filing of this lawsuit, CSX hired Lawson as a conductor trainee, working out of Terre Haute, despite CSX's continued belief that Lawson's work history did not meet CSX's requirements for the position. *See* Def.'s Material Facts ¶ 60 n. 3.[12]

## Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

### B. ADA Claim

The ADA was enacted by Congress to combat discrimination against disabled individuals. *See* 42 U.S.C. § 12101(b)(1). One way that the ADA provides protections to disabled individuals is by making it

---

**11.** CSX has since clarified its position, stating that the only considerations that impacted the initial decision not to employ Lawson were his lack of a solid employment history, the fact that he did not evidence responsibility, safety or dependability and that Lawson did not offer a reason to support an exception being made in his situation. *See* Def.'s Material Facts ¶ 75. By the time CSX's letter had been written to the ICRC, CSX had attempted and failed to verify Lawson's employment and had obtained evidence that Lawson may also have misrepresented his employment experience on his CSX application. *See* Def.'s Reply to Additional Material Facts ¶¶ 130, 131 (citing Ryan Dep. at 42, 115, 140).

**12.** CSX's action of eventually hiring Lawson as a result of settlement negotiations does not amount to an admission on CSX's part that it discriminated against Lawson.

unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regards to ... hiring ...." § 12112(a). A plaintiff in an ADA case may offer either direct proof of disability discrimination or may use the burden shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir.1997). Lawson admits that he has no direct evidence of discriminatory intent and instead relies on his efforts to create an inference of discrimination via indirect evidence using the *McDonnell Douglas* paradigm. *See* Pl.'s Resp. at 14; Def.'s Brief in Support of Summ. J. at 10.

■ Under the *McDonnell Douglas* approach, Lawson must first establish a prima facie case of discrimination. To prove a *prima facie* case of discriminatory refusal to hire under the ADA, Lawson must show (1) that he suffers from a disability as defined by the ADA; (2) that he was qualified for the position which he sought; (3) that he was not hired for the position; and (4) that the circumstances surrounding the company's decision not to hire him indicate that it is more likely than not that his disability was the reason he was not hired. *See Weigel*, 122 F.3d at 465; *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir.1997).

If Lawson is able to establish his *prima facie* case of discrimination, an inference of impermissible discrimination arises and the burden of production shifts to CSX to articulate a legitimate, nondiscriminatory reason for its action. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir.1997); *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1424 (7th Cir.1986). If CSX does so, the inference of discrimination dissolves and Lawson must prove that CSX's proffered reasons are false and only a pretext for discrimination. *See Crim v. Board of Educ. of Cairo Sch. Dist.*, 147 F.3d 535, 540 (7th Cir.1998). Pretext is much more than a mistake, however, it is "a lie, specifically a phony reason for some action." *Russell*, 51 F.3d at 68.

■ A plaintiff may establish pretext in two ways. Pretext may be established directly with evidence that the employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993) (citations omitted). Indirect evidence of pretext showing that an employer's proffered reasons are not credible may be made by demonstrating that the reasons are factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action, although plaintiffs must also provide evidence of at least an inference that the real reason for the employment action was discriminatory. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir.1999); *see also King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir.1999) ("[T]he plaintiff must proffer significantly probative admissible evidence showing that the employers articulated reason for the discharge was a pretext for discrimination."); *Helland v. South Bend Community Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996), *cert. denied*, 519 U.S. 1092, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997) ("[T]he pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate."). In the event that the defendant provides multiple reasons for its employment decision, the plaintiff must respond by attacking the credibility and honesty of each of the reasons. *See Russell*, 51 F.3d at 69; *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir.1998). The ultimate burden of proving that intentional discrimination was the reason for the challenged conduct " 'remains at all times' " with Lawson. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*quoting Texas Dep't of Com-*

*munity Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### 1. The prima facie case

As noted above, the *prima facie* case that Lawson must establish has four elements. Lawson must prove that: (i) he suffers from a disability; (ii) he was qualified for the conductor trainee position at CSX; (iii) he was not hired for that position; and (iv) the circumstances surrounding CSX's decision not to hire him indicate that it is more likely than not that his disability was the reason he was not hired. *See Weigel,* 122 F.3d at 465; *Leffel,* 113 F.3d at 793. CSX claims that Lawson has failed to satisfy his burden of showing he is disabled, that he was qualified for the conductor trainee position at CSX, and that the circumstances surrounding CSX's decision indicate that it is more likely than not that Lawson's disability was the reason he was not hired.

### a. "Disability" under the ADA.

#### i. Waiver

Before discussing the substantive arguments regarding whether Lawson is disabled, as defined by the ADA, we first address Lawson's contention that CSX may not properly raise this issue. At the time this summary judgment motion was filed, Seventh Circuit precedent held that the term "disabled," as defined by the ADA, required us to look at the plaintiff without taking into account any measures that mitigated the individual's impairment. *See Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 629–30 (7th Cir.1998). Based upon the then-existing state of the law, CSX originally stipulated for the purposes of summary judgment that Lawson was "disabled" under the ADA. *See* Defendant CSX Transportation, Inc.'s Brief in Support of Its Motion for Summary Judgment ("CSX Initial Brief") at 12 n. 7. While this motion was pending before us, the United States Supreme Court issued three opinions simultaneously that rejected the Sev-

enth Circuit's position and directed that our determination of whether the plaintiff is "disabled" must be made with reference to measures that mitigate his impairment. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2145–46, 144 L.Ed.2d 450 (1999); *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999); *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999).

Based on this change in a potentially dispositive aspect of the case, CSX moved for leave to file a supplemental brief on the issue of whether Lawson was, in fact, disabled under the ADA. *See* CSX's July 1, 1999 Motion. Receiving no objection to CSX's request, we granted leave to supplement CSX's briefing to address Lawson's status as disabled. *See* Court's July 15, 1999 Entry. One of Lawson's responses to CSX's delayed argument is that CSX's earlier stipulation that "Lawson's disease, in its unmitigated state, constitutes a ['disability']" amounts to a waiver of this issue and "CSX should be bound by its stipulation." Lawson's Resp. to Suppl. Brief ("Suppl.Resp.") at 2–3.

■ Lawson's argument is misguided. First, it would be manifestly unfair to bind CSX to a stipulation made in the face of Circuit precedent that was later overturned and directly contradicted by Supreme Court rulings made while the motion was pending. *Cf. Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir.1999) (remanding case for reconsideration in light of *Sutton*). Second, if there has been a waiver, it is Lawson who has waived the right to contest whether CSX has a right to address whether he is disabled or not. Lawson had an opportunity to raise this issue but failed to oppose CSX's motion seeking leave to make this new claim. Having not opposed the motion, Lawson cannot now argue against the motion by belatedly opposing CSX's right to brief the issue in the first place. Finally, holding CSX to the

stipulation would in any event not relieve us of the responsibility to address the significance of Lawson's diabetes in its mitigated state. Lawson's own brief clarifies the stipulation, saying that "Lawson's disease, it its unmitigated state, constitutes a substantial limitation on a major life activity." Lawson's Resp. to Suppl. Brief at 3. Following *Sutton, Murphy,* and *Albertson's,* the parties' earlier stipulation is irrelevant to our decision. The facts and circumstances of Lawson's disease in its unmitigated state are not before us, only the disease considered in light of all means Lawson has taken to control its effects upon him. For these reasons, we find that CSX has not waived its challenge to Lawson's status as "disabled" under the ADA and may proceed to assert it and have it considered on the merits.

### ii. Statutory definition of disabled.

We turn now to the question of whether Lawson has established that he is "disabled." Under the ADA, an individual is disabled if he (1) has a physical or mental impairment which substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); *DePaoli v. Abbott Lab.,* 140 F.3d 668, 671 (7th Cir.1998). The Act itself sheds little light on the meaning of these terms, so courts routinely rely upon Equal Employment Opportunity Commission ("EEOC") regulations implementing Title I of the ADA. *See* 29 C.F.R. § 1630 *et seq.; see also Baulos v. Roadway Express, Inc.,* 139 F.3d 1147, 1151 (7th Cir.1998) (utilizing EEOC regulations to define "disability" under the ADA and finding summary judgment proper where truck drivers failed to prove that their sleep impairments were disabilities).

The EEOC regulations define "physical or mental impairment" as:

(1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) [a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." § 1630.2(i). This list is meant to be illustrative not exhaustive. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2205, 141 L.Ed.2d 540 (1998). An activity may still be a major life activity even if it is not on this "representative list." *Id.* (holding that reproduction is a major life activity).

"Substantially limited" means, among other things, "[s]*ignificantly restricted* as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." § 1630.2(j) (emphasis added); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 506 (7th Cir.1998) ("Not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test."). " 'Substantially' suggests 'considerable'. or 'specified to a large degree.' " *Sutton,* 119 S.Ct. at 2150.

It is in deciding if the plaintiff is "substantially limited" that the Supreme Court's recent pronouncements directing an accounting for mitigating measures come into play. Our determination of whether an impairment exists remains as before, "but if the impairment is corrected it does not 'substantially limi[t]' a major life activity." *Id.* at 2147. The phrase appears in the ADA in present tense and "is properly read as requiring that a person be *presently—not potentially or hypo-*

*thetically*—substantially limited in order to demonstrate a disability." *Id.* at 2146 (emphasis added). "A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Id.*

█ Lawson has sufficiently alleged that he suffers from a variety of conditions that are appropriately classified as physical impairments. The undisputed facts before us clearly establish that Lawson suffers from diabetes, a disorder that affects many of the organ systems in his body.[13] Lawson's diabetes, and its complications, affect Lawson's metabolic, vascular, urinary, and reproductive systems as well as his joints and eyes. *See* Additional Material Facts ¶¶ 78, 80–82; Skierczynski Aff. ¶¶ 6, 15, 18. In addition to these diabetes related ailments, Lawson also suffers from depression and high blood pressure, *see id.* ¶¶ 6(c), (k), which are physical and mental impairments.

Despite his having shown that he suffers from one or more impairments, Lawson still bears the burden of proving that these impairments substantially limit one of his major life activities. In his response to CSX's supplemental brief on the issue of disability, Lawson identifies a number of

his "major life activities" that are substantially limited: "the regulation of endocrine and renal functions, the metabolism of food, the daily activity of eating, and the maintenance of overall good health, free of debilitating and recurring diabetes-related medical problems." Suppl. Resp. at 10–11. He continues by maintaining that the limitations of these major life activities combine to substantially limit his ability to work. *See id.* at 12. After reviewing the evidence, we are not persuaded that Lawson has sufficiently shouldered his burden to identify a major life activity that has been substantially limited by virtue of his diabetes.[14]

█ Lawson runs into problems from several directions in arguing that he is substantially limited in a major life activity. First, Lawson argues that his diabeties will inevitably lead to conditions that will substantially limit major life activities. *Sutton* makes clear, however, we are not to look to the future or past in deciding if an activity is substantially limited. *Id.* at 2146. The long-term prognosis for an insulin-dependent diabetic has no bearing on our determination of whether that diabetic is currently disabled. Neither is the diabetic's medical history, at least where that history shows no current adverse state.

13. In addition to Lawson's supplemental briefing on the issue of whether he is disabled, Lawson has submitted a surveillance report produced by the Centers for Disease Control and Prevention on the general impact of diabetes on those who suffer from it. *See* Pl.'s Submission of Evidentiary Materials, Ex. 2. CSX objects both to the admissibility and to the relevancy of this exhibit. *See* Reply Brief of CSX in Support of the Supp. to Its Mot. for Summ. J. at 3. We agree with CSX that this report is irrelevant to this proceeding. The report, by its very nature, discusses the impact of diabetes on the general population and diabetics as a group. While this discussion may have some bearing on the question of whether diabetes should be *per se* a disability under the ADA, this question has so far been unequivocally answered in the negative. *See Sutton,* 119 S.Ct. at 2147 (stating that finding all diabetics disabled would be "contrary to both the letter and the spirit of the

ADA."); *Baert,* 149 F.3d at 631 ("[w]e are not holding that insulin-dependent diabetes . . . is a disability as a matter of law."). On the issue of how Lawson's diabetes is currently affecting him, this report is silent and, therefore, entirely irrelevant. Accordingly, we exclude the report as part of the evidentiary record before us.

14. To the extent Lawson claims that these "activities" are substantially limited in his untreated state, *Sutton, Murphy,* and *Albertsons* clearly eliminate this argument from his arsenal. Dr. Skierczynski's opinion to the contrary, the Supreme Court requires that we look at Lawson taking into account the treatments that he is utilizing to control the effects of diabetes. *See Sutton,* 119 S.Ct. at 2145–46; *Murphy,* 119 S.Ct. at 2137; *Albertson's,* 119 S.Ct. at 2169.

Diabetes is a chronic, debilitating disease that ultimately may cause the body to wear down. An insulin-dependent diabetic may eventually face blindness, renal failure, strokes, or other breakdowns that could kill or permanently disable him. However, these eventual, possible complications are not relevant to our deciding if the diabetic is *currently* disabled. Whether Lawson can expect to suffer eventually from renal failure or can expect to go blind at some time in the future due to his diabetes is not germane to the issue of whether he is currently disabled.

Even in limiting our consideration to Lawson's present physical and mental condition, Lawson's contentions face insurmountable obstacles. Both Dr. Skierczynski and Lawson attempt to label as "major life activity" several conditions which do not comfortably fit that description. The Supreme Court's rationale in *Sutton* suggests that Lawson's attempts to characterize functions such as regulating endocrine and renal functions, metabolizing food, and the maintenance of overall good health free of debilitating and recurring diabetes-related medical problems as "major life activities" are ill conceived.

In *Sutton,* the Court specifically addressed diabetes and its effects. *See id.* at 2147. If we were to fail to account for mitigating measures, the Court noted, all diabetics would be considered disabled "because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes." *Id.; see also Weber v. Strippit, Inc.,* 186 F.3d 907, 913 (8th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 794, 145 L.Ed.2d 670 (1999) (noting that plaintiff was confusing the terms 'impairment' 'major life activity' and 'disability' by trying to treat "having a fully functioning cardiovascular system" as a disability under the ADA and holding

that it is properly considered an impairment not a disability); *Gilday v. Mecosta County,* 124 F.3d 760, 765 (6th Cir.1997) (considering fluctuating blood sugar levels to be an impairment, but treating working as the major life activity in question). The Supreme Court clearly is not considering "monitoring blood sugar levels" to be a major life activity; rather it is looking at how the diabetic's success in monitoring his blood sugar levels would impact actual activities in which he was engaged.

The Supreme Court also referenced the fact that a number of people would fall within the ADA's broad reach if disability status were determined without accounting for mitigating measures. Congress intended the ADA to protect the "some 43,-000,000 Americans [who] have one or more physical or mental disabilities." § 12101(a)(1). This "figure is inconsistent" with a methodology that defines disability in relation to the plaintiff's untreated state. *Sutton,* 119 S.Ct. at 2147. Likewise, the figure is inconsistent with an approach that considers a "major life activity" to be the normal functioning of all of the body's systems.

■ Lawson's approach fails to account for the fact that the ADA has been interpreted to take a functional approach, not a health condition approach, in defining disability. *See id.* at 2148–49. The ADA's precursor determined that "37.3 million individuals have 'difficulty performing one or more basic physical activities,' including, 'seeing, hearing, speaking, walking, using stairs, lifting or carrying, getting around outside, getting around inside, an getting into or out of bed.'" *Id.* at 2148 (quoting On The Threshold Of Independence at 19 (1988)). Although it is not clear that the 43 million figure quoted in the ADA is derived directly from this report, the similarity between the two figures indicated to the Supreme Court in *Sutton* that this 1988 report provided the ADA's numerical rationale. *See id.* Utilizing Lawson's broad definition of major life activities would open the ADA to countless potential

plaintiffs who have innumerable conditions that cause their bodies to function in ways outside normal parameters, notwithstanding the conditions' impacts on the plaintiffs' daily activities. The definition of a major life activity must be limited in some principled, reasonable manner; that is the teaching of the Court's rulings in *Sutton, Murphy,* and *Albertson's.*[15] We thus determine that regulating endocrine and renal functions, metabolizing food, and the maintenance of overall good health free of debilitating and recurring diabetes-related medical problems are not "major life activities" under the ADA.

Lawson also alleges that he is substantially limited in the "major life activity" of working. To prove that a disability is a substantial limitation on work, a plaintiff must show that the disability significantly restricts the person's ability to perform a class of jobs or a broad range of jobs in various classes. *See Sutton,* 119 S.Ct. at 2150–51; *Murphy,* 119 S.Ct. at 2138; *Skorup v. Modern Door Corp.,* 153 F.3d 512, 514 (7th Cir.1998); *Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1097 (7th Cir.), *cert. denied,* 525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998); *Davidson,* 133 F.3d at 506–07. Determining whether an individual is disabled so as to be substantially limited in the major life activity of working requires an individualized assessment. *See Byrne v. Board of Educ., Sch. of West Allis–West Milwaukee,* 979 F.2d 560, 565 (7th Cir.1992).[16]

An impairment is not a disability within the meaning of the ADA if it merely renders an individual unable to perform a particular job for a particular employer. *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454–55 (7th Cir.1995); 29 C.F.R. § 1630.2(j)(3)(i). Rather, "the impairment must substantially limit employment generally." *Byrne,* 979 F.2d at 565. That is to say, the individual must be significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes. *See Weiler v. Household Fin. Corp.,* 101 F.3d 519, 525 (7th Cir.1996); 29 C.F.R. § 1630.2(j)(3)(i). It is also inconsistent for a plaintiff to claim that his ability to work is substantially limited and simultaneously be employed in either the same position he was seeking or one similar to the position he was seeking. *See Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1197–98 (7th Cir.1997); *Korzeniowski v. ABF Freight Sys., Inc.,* 38 F.Supp.2d 688, 693 (N.D.Ill.1999).

Lawson's own testimony shows that he is not substantially limited in his ability to work. Although Lawson argues

**15.** Lawson relies upon *Erjavac v. Holy Family Health Plus,* 13 F.Supp.2d 737 (N.D.Ill.1998), to support the view that metabolizing food, regulating endocrine and renal functions eating and the elimination of waste constitute major life activities. While that was clearly the holding in that case, that court defined major life activities as any function essential to sustain life. *See id.* at 747. The reasoning in *Erjavac* effectively creates a *per se* disability by folding the impairment inquiry into the substantial limitation of a major life activity inquiry. *See* Issac S. Greaney, Note, *The Practical Impossibility of Considering the Effect of Mitigating Measures under the Americans with Disabilities Act of 1990,* 26 Fordham Urb. L.J. 1267, 1290 (1999); *cf. Sutton,* 119 S.Ct. at 2147 (stating that finding all diabetics disabled would be "contrary to both the letter and the spirit of the ADA."); *Baert,* 149 F.3d at 631 ("[w]e are not holding that insulin-dependent diabetes ... is a disability as a matter of law."). It is also important to

recognize that *Erjavac* was decided before the Supreme Court's most recent rulings. Taking *Sutton* into account, we respectfully decline to follow the Northern District of Illinois' broad interpretation of "major life activity."

**16.** Although *Byrne* was decided under the Rehabilitation Act of 1973, the courts have applied Rehabilitation Act cases in interpreting the ADA. *See, e.g., Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928 (7th Cir.1995). In fact, in enacting the ADA, Congress borrowed language from the Rehabilitation Act and indicated explicitly that the caselaw developed under the prior act would be generally applicable to analyzing the term "disability" under the ADA. *See Palmer v. Circuit Court of Cook County, Soc. Serv. Dep't,* 905 F.Supp. 499, 506 n. 7 (N.D.Ill.1995), *aff'd,* 117 F.3d 351 (7th Cir.1997), *cert. denied,* 522 U.S. 1096, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998).

that his ability to work is substantially limited by his diabetes, *see* Pl.'s Resp. to Suppl. Br. at 12, he has not provided much in the way of evidence to support that claim. The only actual testimony about the impact of his treated diabetes is that Lawson claims to have told Ryan and Layne that in his view his lack of employment experience was the result of his diabetic condition and that he had been totally disabled for a number of years. *See* Lawson Aff. ¶ 16. However, this self-serving assertion is not supported by any other testimony or evidence. Lawson is not a physician and is not qualified to testify authoritatively that diabetes, or its complications, made him physically unable to work. Moreover, Lawson has been able to work in the very position he sought from CSX since shortly after this litigation was filed. *See* Def.'s Material Facts ¶ 60 n. 3. In the absence of credible evidence that Lawson did not work in prior years due to his diabetes, and given Lawson's undisputed ability currently to hold the position he sought and desired at CSX, Lawson has not established that he is sufficiently limited in his ability to work to be deemed disabled.

Finally, Lawson claims that the major life activity of eating is substantially limited by his diabetes. The ability to eat is a basic, daily function affecting the general population and is appropriately considered a "major life activity." *See* Weber, 186 F.3d at 914; *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424–25 (8th Cir.1999); *Erjavac*, 13 F.Supp.2d at 746–47; *Dikcis v. Indopco Inc.*, 1998 WL 13323, at *4 (N.D.Ill. Jan.7, 1998); *Kriskovic v. Wal–Mart Stores, Inc.*, 948 F.Supp. 1355, 1362 (E.D.Wis.1996). A person's ability to eat is substantially limited when the actual physical ability to ingest food is restricted. *See Amir*, 184 F.3d at 1027 (inability to eat any food without vomiting is significant limitation). However, simple dietary restrictions alone are not sufficient to constitute a significant limitation on this activity. *See Weber*, 186 F.3d at 914; *Land*, 164 F.3d at 425; *Ingles v. Neiman Marcus Group*, 974 F.Supp. 996, 1001–02 (S.D.Tex.1997). *But see Erjavac*, 13 F.Supp.2d at 747 (holding that plaintiff's diabetes required her to eat specific foods on a constant basis and therefore significantly restricts her ability to eat). To conclude that dietary restrictions alone suffice to significantly restrict a plaintiff's ability to eat would turn the ADA into something it is not—"a general protection of medically afflicted people." *Christian v. Saint Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir.1997), *cert. denied*, 523 U.S. 1022, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998) (refusing to recognize high cholesterol as a disability under the ADA).

Numerous people in our society face the daily rigors of a restricted diet. Persons with disorders such as high cholesterol, high blood pressure, food allergies, obesity and lactose intolerance must bear the consequences of monitoring the types and quantities of foods that they eat. To follow the rationale espoused by Lawson and the reasoning utilized in *Erjavac* would open the ADA to numerous people far beyond those who realistically fit within the "43,000,000" cited in the statute's preamble. Allowing the dietary restrictions faced by all insulin-dependent diabetics, in particular, to constitute a significant restriction of a major life activity would be no different than establishing the *per se* rule that diabetes is a disability. As we noted before, both the Supreme Court and the Seventh Circuit have refused to establish this *per se* rule, and we will not do so now.

Lawson's evidence establishes that his diabetes requires him to follow a dietary plan. *See* Skierczynski Aff. ¶ 12. When taking insulin, he must restrict the type of food he eats and the quantity that he ingests. *See id.* ¶ 14. If his blood sugar drops, he must immediately find the right kinds of foods to bring levels back to normal, or suffer serious complications.

*See id.* These restrictions lead Lawson and Dr. Skierczynski to conclude that his eating is substantially limited. However, nowhere does Lawson or Dr. Skierczynski testify that Lawson's physical ability to eat is in any way restricted by his diabetes. Unlike the plaintiff in *Amir*, Lawson's attempts to eat do not lead to vomiting. The combination of Lawson's dietary plan and the insulin that he takes allow him to compensate for the limitations that diabetes imposes on his body's ability to digest food. We thus conclude that Lawson has failed to show that he is significantly restricted in his ability to eat.

Having now disposed of each of the major life activities that Lawson has set out, we are left with the conclusion that Lawson is not "disabled," as defined by § 12102(2)(A). Although he suffers from diabetes and its complications, Lawson has not established through admissible evidence that any of these impairments substantially limits a major life activity. Having failed to do so, Lawson has not established that he satisfies the ADA's first definition of disability.

### b. "Record of" an impairment.

A person may also be disabled under the ADA if there is a "record of" an impairment that substantially limits a major life activity. *See* § 12102(2)(B). A finding that a plaintiff is not disabled under § 12102(2)(A) does not preclude a finding that he has a record of a disability. After *Sutton*, § 12102(2)(A) is to be explicitly focused upon the plaintiff's current state. *Id.* at 2146. Section 12102(2)(B) extends the coverage of the ADA to persons who "ha[ve] a history of . . . having, a mental or physical impairment *that substantially limits one or more major life activities*." *Davidson*, 133 F.3d at 509 (quoting 29 C.F.R. § 1630.2(k)) (emphasis added); *see also Roth*, 57 F.3d at 1456–57. This coverage includes people who have "recovered from previously disabling conditions . . . but who may remain vulnerable to the fears and stereotypes of their employers." *Davidson*, 133 F.3d at 509 (citing 29

C.F.R. Pt. 1630, App. § 1630.2(k) (Interpretive Guidance); 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 907(a), at 5323–24); *see also School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (Rehabilitation Act) (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 405–06 n. 6, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). A plaintiff could show a record of a substantially limiting impairment if he provides evidence that he faced such limitations in the past even if he is not presently substantially limited. *See Davidson*, 133 F.3d at 509; *Roth*, 57 F.3d at 1456–57. Still, it is not enough that this record of an impairment exists for the plaintiff to make a "record of impairment" claim; the plaintiff must also provide proof that the employer was aware of the record in question. *See Davidson*, 133 F.3d at 510 n. 8; *Roth*, 57 F.3d at 1457; 29 C.F.R. Pt. 1630, App. § 1630.2(k) (interpretive guidance).

Lawson has been unable to show that he has such a record. Lawson's medical record does reflect frequent hospitalizations prior to 1984. *See* Lawson Dep. at 32; Skierczynski Aff. ¶ 6(d). Treatments, however, have allowed him to stay out of the hospital since 1984. *See* Lawson Dep. at 31–33. Lawson asserts that this history of hospitalizations establishes the necessary record, *see* Pl.'s Resp. to Supp. Br. at 11 (citing *Arline* ), but his proof falls short of establishing that these hospitalizations *substantially limited a major life activity.*

Lawson asserts the same "major life activities" discussed previously. As we discussed above, *see supra*, the only activities asserted by Lawson as qualifying under the ADA's definitions are the ability to eat and work. Lawson provides no evidence to indicate that his ability to eat was limited in the past any more than it is today; thus, we conclude that Lawson did not face a substantial limitation in the past in terms of his ability to eat.

Lawson has also failed to establish that his ability to work was ever substantially limited. Examining the evidence in a light most favorable to Lawson shows that other

than brief hospital stays due to carpal tunnel syndrome, laser eye surgery and a tonsillectomy, the vast majority of his hospitalizations occurred prior to his graduation from high school. *See* Lawson Dep. at 32; Def.'s Material Facts ¶ 37. Since Lawson was enrolled in school until 1984, we assume that any claims about restrictions on his ability to work relate to the period 1985 to present.[17] Lawson maintains nonetheless that he informed Ryan and Layne that his lack of employment experience was the result of his diabetic condition and that he had been totally disabled for a number of years. *See* Lawson Aff. ¶ 16.

Assuming Lawson genuinely believes that this was the reason for his unemployment, his testimony alone is insufficient to establish that he medically was unfit to work. As we stated before, Lawson is not qualified to offer a medical opinion as to the reason he was unable to work, and the only corroborating evidence he provides is that he was receiving total disability payments from Social Security from August 1986 through the date that the lawsuit was filed, in November 1998. *See* Def.'s Material Facts ¶ 44. However, Social Security's and the ADA's definitions of disability are not synonymous. *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1601, 143 L.Ed.2d 966 (1999) (finding that an ADA suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job, or other jobs, without it). Moreover, between 1986 and 1991, Lawson was employed at Eldred Van and Storage and Belson Scrap and Steel. *See* Def.'s Material Facts ¶¶ 47, 49. These positions suggest that Social Security's determination that Lawson should be on total disability is not tantamount to a conclusion that he was substantially limited in his ability to work.

### c. Conclusion

Lawson has failed to establish that he currently has an impairment that substantially limits any major life activities or that he has a record of having had an impairment that substantially limited in any major life activities. This inability to establish either of these propositions means that he has failed to satisfy the first prong of the *prima facie* case—that he that he is disabled under the ADA—a failure that dooms his discrimination claim.

### 2. Legitimate nondiscriminatory reason for CSX's decision and pretext.

Assuming, for sake of argument, that Lawson has satisfied the burden of his *prima facie* case, his claim still would fail because CSX has responded with a legitimate nondiscriminatory reason for its decision not to hire him and Lawson has not shown that CSX's reason was pretextual.[18] CSX maintains that Lawson was not hired because of his scanty work history, which reflected a total of only five months of employment at two separate jobs during

---

**17.** Regardless, the only evidence provided relative to the impact of diabetes on Lawson prior to 1984 is that none of his social or extracurricular activities prior to and including high school were restricted by his diabetes. *See* Pl.'s Additional Material Facts ¶ 83. Accordingly, Lawson has not provided any indication that any major life activity was substantially limited by the hospitalizations that occurred before he graduated from high school.

**18.** Although we need not dwell at length on the issue, we also do not believe Lawson has sufficiently established the remainder of his *prima facie* case. The parties dispute both whether Lawson was qualified for the position and whether the circumstances show that it is more likely than not that CSX discriminated against Lawson by refusing to hire him. Since we are able to decide this case on other issues, we will not attempt to resolve this dispute. *See Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir.1998) ("Because we find that [the defendant] has met its burden of articulating legitimate reasons for the discharge, we proceed directly to whether [the plaintiff] presented evidence sufficient to create a genuine issue of material fact with regard to pretext."), *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 149–50 (7th Cir.1996) ("[T]his court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination

the previous ten years, *see* Def.'s Material Facts ¶ 74, which record did not "demonstrate responsibility, safety or dependability" and further that Lawson "did not offer CSX any reason to make an exception in his case." Def.'s Material Facts ¶ 75. This reason suffices to meet the limited burden CSX faces in being required simply to produce a legitimate, nondiscriminatory reason.

Lawson responds that CSX was not looking for someone with a "solid" work history, as evidenced by its failure to place that requirement in the job description created by Ryan and based on his view that the requirement had no bearing on the conductor trainee position. *See* Pl.'s Resp. at 25–26. Lawson bases his view, in part, on the fact that there were no written procedures explaining what a "solid" work history means. *See* Additional Material Facts ¶¶ 138, 139.

Lawson also disputes that "responsibility, safety, and dependability" were important factors to CSX. CSX's past practice of making exceptions for persons with limited or unskilled employment experience, applicants whose employment could not be verified, applicants without a high school diploma or GED, and even applicants with criminal records including unresolved felony convictions belies its current contentions. *See* Additional Material Facts ¶¶ 121, 122, 127. CSX explains that the exceptions it has made have occurred when an offer is made to someone who does not meet all of CSX's preferences but who has made a positive impression during the interview. *See* Def.'s Material Facts ¶ 74 n. 5. According to CSX, hiring involves some "subjectivity on the part of the interviewer(s), and dependent upon the applicant's effort and ability to 'sell themselves' during the interview process." *Id.*[19]

■ We examine Lawson's contentions bearing in mind that he retains at all times the ultimate burden to prove discrimination. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. In so doing, we find that Lawson has failed to establish that CSX's proffered reasons are not credible. We do not "sit

---

question notwithstanding a dispute over a fact necessary for a *prima facie* case."); *see also United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."); *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985) ("[T]he prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination."). We only discussed the disability issue given the new terrain of Seventh Circuit precedent following the Supreme Court's decisions in *Sutton, Murphy,* and *Albertsons.*

19. Lawson asserts that CSX claimed to base its rejection of Lawson's application on three additional, pretextual reasons. *See* Pl.'s Resp. at 25–28. Lawson claims, though CSX disputes, that Ryan told him one reason for the rejection was that Lawson did not have three years of continuous employment. *See* Additional Material Facts ¶ 119. Lawson also cites CSX's response to his complaint filed with the ICRC wherein CSX contended that its rejection of Lawson was justified by its inability to verify his employment and Lawson's misrepresentation of his work history on his application. *See* Pl.'s Resp. at 25–28 (citing Additional Material Facts ¶ 130). Ryan admits that she did not attempt to verify Lawson's employment prior to making the decision not to hire him and states that, as far as she was concerned, her inability to verify Lawson's employment had no bearing on her decision. *See* Additional Material Facts ¶¶ 131, 132. CSX has since conceded that no effort was made to verify Lawson's employment history prior to making the decision not to hire him but that by the time CSX's letter had been written to the ICRC, CSX had attempted and was unable to verify Lawson's employment and had also obtained evidence that Lawson may have misrepresented his employment experience on his CSX application. *See* Def.'s Reply to Additional Material Facts ¶¶ 130, 131. Even if we were to conclude that Lawson has proven that some of these were not the true reasons for CSX's decision, if Lawson fails to prove that CSX's interest in responsibility, safety, and dependability was pretextual, this reason, standing alone, would prevent Lawson from being able to prove pretext. *See Russell,* 51 F.3d at 69; *Adreani,* 154 F.3d at 395.

as a super-personnel department that re-examines an entity's business decisions." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986). While Lawson claims that CSX has made past exceptions to its stated requirements, we do not find that such exceptions negate in any meaningful way CSX's legitimate concerns about safety, responsibility, and dependability. In fact, we admit that we would find it disturbing if CSX did not concern itself with safety, responsibility, and dependability in deciding who to hire and train for this critical position. Within CSX's transportation system, as we have come to understand, the conductor coordinates the activities of train crews engaged in transporting freight on freight trains and supervises the activities of switch engine crews. *See* Def.'s Material Facts ¶¶ 9, 10. These tasks can be both dangerous and physically demanding. *See id.* ¶ 11. Conductors usually work outdoors, performing their duties around moving equipment where there are many distractions. *See id.* ¶ 12. Given the key role assumed by the conductor, the attributes emphasized by CSX in hiring conductors are certainly relevant to that position.

Responsibility, safety, and dependability are also germane to the conductor trainee position. CSX hires trainees in an effort to bring them to a point where they can serve as conductors. *See* Def.'s Material Facts ¶¶ 6, 8. CSX hopes and expects trainees to become conductors. *See id.* Accordingly, responsibility, safety, and dependability are reasonable traits to emphasize with trainees and are properly considered by the CSX interviewers.

Any exceptions to CSX policy emphasized by Lawson have been made under specific circumstances; Lawson gives us no information about these candidates' overall qualities. Looking at a single characteristic alone likely would not provide the whole picture of an applicant. Having failed to finish a GED program or having had only limited employment experience does not automatically mean that the applicant also fails to demonstrate responsibility, safety or dependability. CSX has

included a personal interview as part of the hiring process to give interviewers the opportunity to exercise their best discretion in evaluating applicants, including on a partially subjective basis, to determine if applicants are fit for the position in an overall sense, despite apparent specific deficiencies that may appear on the face of the application. There is nothing inherently discriminatory in utilizing this process, despite the fact that it lacks hard-and-fast, written procedures and standards applicable in every case.

Lawson admits that his own work history does not demonstrate responsibility, safety, or dependability. *See* Pl.'s Resp. to Def.'s Material Facts ¶ 75. While he disputes whether CSX actually looks for these qualities, he does not dispute that he gave Ryan and Layne no reason to make an exception in his case based on these failures. *See* Def.'s Material Facts ¶ 75; Pl.'s Resp. to Def.'s Material Facts ¶ 75.

Lawson telephoned Ryan shortly after learning that he had not been hired. In this conversation, Ryan told Lawson that one reason for CSX's decision was the prolonged lapse since Lawson's last job at Belson. *See* Ryan Dep. at 109. Lawson does not contest that Ryan told him that if "[he] wanted to go flip hamburgers for a year, [CSX] would reconsider [his] application." Def.'s Material Facts ¶ 76. These comments substantiate Ryan's stated concern over Lawson's lack of work experience since 1991. It also indicates that Ryan was not foreclosing Lawson's ever obtaining employment with CSX; apparently, however, she felt Lawson needed to provide them with something more before they were willing to allocate the necessary resources to train him.

Lawson has failed to show that CSX's desire for responsibility, safety, and dependability is an important consideration when it makes its hiring decisions regarding conductor trainees. He has also failed to show that his application or interview gave CSX any reason to believe that he had these qualities. Lawson's failure to carry his burden of establishing that the

real reason CSX did not hire him was discriminatory based upon his alleged disability is a critical failure and Lawson's claim of pretext is similarly lacking. For all these reasons, Lawson's claims of discrimination under the ADA fail and CSX's motion for summary judgment is must be granted.

### Conclusion

For the reasons discussed, we *GRANT* CSX's motion for summary judgment as to Lawson's Amended Complaint in its entirety.